# EXHIBIT A

Exhibit A

PLAINTIFFS' MOTION FOR: 1) MODIFICATION OF THE STAY PENDING ARBITRATION; 2) LEAVE TO AMEND THE COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT – ADVERSARY NO. BPI 0033

Daren R. Brinkman (State Bar No. 158698)
Laura J. Portillo (State Bar. No. 186813)
BRINKMAN PORTILLO, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Telephone: (818) 597-2992
Facsimile: (818) 597-2998

Special Counsel to Betta Products Inc., and
Special Counsel to the Betta Products Inc.
Litigation Trust

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SANTA ROSA DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 03-10925 AJ |
| BETTA PRODUCTS, INC., a California Corporation | Chapter 11 |
| | Adversary No. 05-01046 |
| Debtor. | [PROPOSED] AMENDED COMPLAINT |
| BETTA PRODUCTS, INC., | |
| Plaintiff, | |
| v. | |
| DISTRIBUTION SYSTEMS AND SERVICES, INC., aka DSS, | |
| Defendant. | |

TO THE HONORABLE ALAN JAROSLOVSKY, UNITED STATES BANKRUPTCY JUDGE AND TO DEFENDANTS NAMED HEREIN:

Betta Products, Inc., (the "Debtor") and Dana McCurnin, the Trustee of the Betta

1

BPI 0034

Products Litigation Trust (collectively, "Plaintiffs") allege as follows:

## I.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334 and 1367. This amended complaint contains core and non-core proceedings under 28 U.S.C. § 157(b) and (c).

2. This adversary proceeding is brought to recover certain property of Betta Products, Incorporated, (the "Debtor") and to recover the property for the benefit of the Debtor's estate pursuant to 11 U.S.C. § 101, *et seq.*, of the United States Code (the "Bankruptcy Code").

3. Venue in this Court is proper pursuant to 28 U.S.C. §1409 as this adversary proceeding arises under and in connection with a case under Title 11 which is pending in this District.

4. Betta Products, Inc., ("Betta") is a California corporation.

5. The Betta Products, Inc. Litigation Trust (the "Trust") is a trust created in and administered in the state of California. Dana McCurnin, the trustee of the Trust, resides in California.

6. Distribution Alternatives, Inc., fka Distribution Systems and Services, aka DSS (hereafter, "DSS") is a Minnesota corporation that does business in California and maintains a warehouse in California.

## II.

## FACTS COMMON TO ALL CAUSES OF ACTION

7. Plaintiffs reallege all facts stated in numbered paragraphs 1 through 6, supra.

8. Betta is a company that sells paper and party products to retail stores in the United States.

9. Betta generally hires foreign manufacturing companies to make the products that it sells to retail stores in the United States.

10. Distribution Systems and Services, Inc., ("DSS") is a company that performs warehousing services.

11. On May 1, 1996 Betta and DSS entered into a contract ("Contract").

12. In the Contract, Betta agreed to pay for and DSS agreed to perform warehousing and distribution services for Betta.

13. The Contract contains a specified list of specific charges for services to be performed for Betta.

14. The Contract does not state that there will be a charge to perform a physical inventory of the Betta products stored in the warehouse.

15. For purposes of this complaint, the term "Product" shall mean all of the items in the DSS warehouse that were owned by Betta and shall exclude all of those items in the warehouse belonging to other DSS clients.

16. Betta agreed to pay a monthly fee for storage of its Products.

17. The business relationship between Betta and DSS under the Contract lasted until May 31, 2004.

18. During the business relationship between Betta and DSS, Betta generally requested that DSS perform physical inventory counts of the Betta products in the DSS warehouse at the end of each year.

19. DSS performed a physical inventory in 1998, 1999, 2000, 2001, and 2002.

20. The last physical inventory DSS performed was on December 31, 2002.

21. On December 31, 2002, Betta sent employees to the DSS warehouses to observe a year-end physical inventory that was conducted by DSS employees.

22. On April 15, 2003, ("Petition Date"), Betta filed for Chapter 11 bankruptcy relief in the Bankruptcy Court of the Northern District of California.

23. DSS continued to do business with Betta after the Petition Date, but required that Betta make regular payments in advance of any invoices.

24. On July 11, 2003, Betta abandoned its entire pre-petition inventory to Wells Fargo, a creditor in the bankruptcy.

25. After July 11, 2003, Wells Fargo took financial responsibility for paying DSS for the monthly storage costs of the pre-petition inventory.

26. Betta continued to be responsible to pay DSS for the storage of post-petition inventory and for all new charges that accrued.

27. On January 20, 2004, DSS shipped a quantity of Betta products to Wells Fargo or to Wells Fargo's agent, Hilco.

28. DSS made no other shipments to Wells Fargo or to Wells Fargo's agent.

29. The quantity of goods that DSS shipped to Wells Fargo was less than the total quantity of the pre-petition goods that Betta abandoned to Wells Fargo.

30. After January 20, 2004, Betta began to pay all of the monthly storage charges for the Betta products, both pre-petition products and post-petition products, being stored by DSS.

31. Betta decided to end its relationship with DSS and hired another warehousing and distribution agent, APL Logistics, Inc. (hereafter, "APL").

32. Betta continued to make requests that DSS ship Betta's Products to Betta's customers, but Betta began to divert new shipments of Betta product to APL.

33. By May 31, 2004, the business relationship between Betta and DSS had ended.

34. The total quantity of goods that DSS shipped to APL was less than the quantity of Betta Products that were stored in the DSS warehouse.

35. In the confirmed plan of reorganization (the "Plan"), the reorganized debtor, Betta, was given the right to sue DSS for any claims and damages and to recover any damages from its claims for itself.

36. Also, as part of the Plan, Wells Fargo assigned to Betta the right to prosecute any and all of Wells Fargo's claims against DSS.

37. The Contract stated that "DSS is responsible for the safe handling and safekeeping of Products delivered to the warehouse location provided by DSS."

38. DSS agreed to reimburse Betta for the value of Products that are lost, stolen, and/or damaged.

39. In the Contract, DSS acknowledged that Betta is the owner of all Products that are delivered to DSS's warehouse and the owner of all documents received and created by DSS while performing the Contract.

40. Under the Contract, DSS agreed to promptly return all of the Product owned by Betta.

41. The business relationship between Betta and DSS ended by May 31, 2004.

42. Betta demanded that DSS ship all of its Product to APL before May 31, 2004.

43. DSS did not ship all of Betta's Product before May 31, 2004.

44. DSS did not pay Betta the value of the Product that it did not ship before May 31, 2004.

45. DSS failed to return all of Betta's Product.

46. DSS also failed to reimburse Betta for the value of the Product that it lost (and therefore could not ship) before May 31, 2004.

47. Betta was directly damaged by DSS's taking or loss of Betta's product in the amount of at least $177,056.99 and in a final amount to be proven at trial.

48. Betta agreed to pay DSS only for its performance of duties as specified in the Contract.

49. DSS charged Betta for services that it did not perform.

50. Betta was forced to pay DSS monthly storage charges for the quantity of post-petition Product that DSS did not deliver or that DSS lost.

51. Betta was damaged in the amount of at least $30,604.06 and in a final amount to be proven at trial, for the monthly storage fees it paid from April 16, 2003 through May 31, 2004 for the post-petition Products that DSS did not deliver to Betta.

52. Betta was also forced to pay DSS carton handling fees for all of the undelivered post-petition Product when it was first shipped into the warehouse.

53. Betta paid DSS a total of $2,691.79 in carton handling fees for all of the undelivered post-petition Product.

54. DSS also charged Betta for each year-end physical inventory, when it had no contractual right to do so.

55. The vice-president of DSS assured the president of Betta that DSS does not charge for one physical inventory each year.

56. Betta was forced to pay for each physical inventory because if Betta did not pay, DSS would stop shipping product to Betta's customers.

57. Betta was damaged in the amount of $61,348.00 and in a final amount to be proven at trial for DSS's decision to charge Betta for the physical inventory counts.

58. DSS also charged Betta the monthly storage fees for all of the undelivered pre-petition product that was left in the DSS warehouse after the January 20, 2004 shipment to Wells Fargo or Wells Fargo's agent.

59. Betta was damaged in the amount of at least $10,210.88 and in a final amount to be proven at trial, for the monthly storage fees for March, April and May of 2004.

60. In sum, Betta was directly damaged by DSS actions in the amount of at least $281,911.72 and in a final amount to be proven at trial.

## III.

### FIRST CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Breach of Contract)

Betta's assertion of claims assigned to it by Wells Fargo

61. Plaintiffs reallege all facts stated in numbered paragraphs 1 through 60, supra.

62. Betta holds an assignment from Wells Fargo to assert any and all claims that Wells Fargo had against DSS.

63. Wells Fargo obtained ownership of all the pre-petition goods on July 11, 2003.

7

AMENDED COMPLAINT

BPI 0040

64. All of the pre-petition goods were located in DSS's warehouse on July 11, 2003.

65. Wells Fargo and DSS observed the terms of the Contract from July 11, 2003 through January 31, 2004, creating a de facto contract between Wells Fargo and DSS.

66. Wells Fargo demanded that DSS ship all of the pre-petition goods to Wells Fargo or Wells Fargo's agent on January 20, 2004.

67. DSS did not ship all of the pre-petition goods to Wells Fargo or to Wells Fargo's agent.

68. DSS breached the de facto contract it had with Wells Fargo by failing to produce all of the pre-petition goods.

69. DSS breached the de facto contract it had with Wells Fargo by failing to reimburse Wells Fargo for the value of all of the pre-petition goods DSS did not deliver to Wells Fargo.

70. Wells Fargo was damaged in the amount of at least $168,355.82 and in a final amount to be proven at trial.

71. Betta now asserts these claims against DSS for DSS's breaches of the Contract and the de facto Contract, alleging that Betta is entitled to recover the sum of at least $450,267.54, and in a final amount to be proven at trial.

IV.

SECOND CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Conversion)

72. Plaintiffs reallege and reassert all the statements made in numbered paragraphs 1 through 71, *supra*.

73. All of the post-petition Products in the DSS warehouse were owned by Betta.

74. DSS failed to deliver at least $177,056.99 (and in a final amount to be proven at trial) worth of post-petition Product to Betta by May 31, 2006.

75. On August 10, 2004 DSS held a sale at which it sold all or most of the $177,056.99 worth of post-petition Product to third parties.

76. DSS has never returned nor compensated Betta for at least $177,056.00 worth of post-petition Product that it failed to deliver to Betta.

77. Betta paid to DSS the sum of at least $104,854.73 for services that DSS never provided.

78. DSS converted Betta's money, in the amount of at least $104,854.73 and in a final amount to be proven at trial, by taking possession of the money and placing it in DSS's general funds.

79. DSS has never returned and refuses to return any sums to Betta for the bogus charges Betta paid in the amount of at least $104,854.73 and in a final amount to be proven at trial.

### Betta's assertion of claims assigned by Wells Fargo

80. DSS held pre-petition Betta Product on behalf of Wells Fargo.

81. The pre-petition Betta Product was owned by Wells Fargo.

82. DSS agreed to store the post-petition Betta Product for Wells Fargo for a fee and according to the terms of the Contract.

83. Wells Fargo demanded that all of its goods be shipped to Wells Fargo or Wells Fargo's agent, Hilco on January 20, 2004.

84. DSS did not comply and did not turn over the goods Wells Fargo demanded.

85. Wells Fargo was damagd in the amount of at least $168,355.82, and in a final amount to be proven at trial.

86. The total of the damages that Betta suffered as a result of DSS's conversion of Betta's personal property was at least $450,267.54, and in a final amount to be proven at trial.

87. Betta also requests consequential damages, in an amount to be proven at trial, including attorneys' fees.

88. DSS's actions in converting Betta's money and property were done deliberately and with malice.

89. Betta should be awarded punitive damages for DSS's willful acts of conversion in an amount sufficient to deter future conduct.

V.

### THIRD CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Breach of Bailment)

(California or Minnesota Common Law)

90. Plaintiffs reassert and reallege all of the facts stated in paragraphs numbered 1 through 89, supra.

91. In the Contract, DSS agreed to act as a bailee of Betta's product, and Betta agreed to bail its product to DSS.

92. All of the Product in the warehouse belonged to Betta

93. Betta gave possession of the Product to DSS but not ownership.

94. Upon demand, DSS failed to return to Betta at least $177,056.99 worth of Product that belonged to Betta and which Betta bailed to DSS.

95. DSS's breach of the bailment agreement with Betta damaged Betta in the amount of at least $177,056.99 and in a final amount to be proven at trial.

**Betta's assertion of claims assigned by Wells Fargo**

96. DSS held pre-petition Betta Product on behalf of Wells Fargo.

97. The pre-petition Betta Product was owned by Wells Fargo.

98. DSS agreed to store the post-petition Betta Product for Wells Fargo for a fee and according to the terms of the Contract.

99. DSS had possession of the post-petition Betta Product but not ownership.

100. Wells Fargo demanded that all of its goods be shipped to Wells Fargo or Wells Fargo's agent, Hilco on January 20, 2004.

101. DSS did not comply and did not turn over the goods as Wells Fargo demanded.

102. Wells Fargo was damaged in the amount of $168,355.82.

103. The total of the damages that Betta suffered as a result of DSS's decision to convert Betta's personal property was at least $450,267.54, and in a final amount to be proven at trial.

## VI.

## FOURTH CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Fraud)

104. Plaintiffs reallege and reassert all statements made in paragraphs numbered 1 – 103, *supra*.

105. In the chart entitled "Inventory Transactions" which is a summary chart created by DSS, DSS states all of the reports that it made to Betta regarding the quantity of each Product in the DSS warehouse.

106. Each statement from DSS to Betta from January 1, 2003 through July 31, 2004 of a shipment into or out of the DSS warehouse was a false statement of fact.

107. DSS's statements to Betta on February 12 of the quantity of each Product that was shipped to Wells Fargo were false statements of fact.

108. DSS's statements to Betta on February 13 of the quantity of each Product that was shipped to Wells Fargo were false statements of fact.

109. DSS's statements to Betta on July 15, 2004 of the quantities of Product that were shipped to APL were false statements of fact.

110. Each of these statements were made to Betta by DSS via electronic exchange, through shared computer files that Betta was able to access through DSS.

111. Each of these statements were made by an employee of DSS, although Betta is unable to identify exactly which DSS employee made the statements, Betta will obtain this information through discovery.

112. Each of these statements was made to Betta's employees, including Dana McCurnin, Summer Beckwith, Dennis Walsh, Thomas Tyler, Carrie Sullivan, Dara Kinsman, and Dawn Wetjen.

113. At the time these statements were made, DSS knew or should have known that the statements were false.

114. At the time each statement was made, DSS intended that Betta would rely on the false representations.

115. DSS knew that Betta relied completely upon the DSS reports for its own billings to clients and for Betta's perpetual inventory records.

116. Betta relied upon DSS's false representations.

117. Betta was damaged in the amount of at least $450,267.54, and in a final amount to be proven at trial.

118. DSS's actions in defrauding Betta were done deliberately and with malice.

119. Betta should be awarded punitive damages for DSS's fraud in an amount sufficient to deter future conduct.

## VII.

## FIFTH CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Negligent Misrepresentation)

120. Plaintiffs reassert and reallege all the statements made in paragraphs numbered 1 through 119, *supra*.

121. In the chart entitled "Inventory Transactions" which is a summary chart created by DSS, DSS states all of the reports that it made to Betta regarding the quantity of each product in the DSS warehouse.

122. Each statement from DSS to Betta from January 1, 2003 through July 31, 2004 of a shipment into or out of the DSS warehouse was a false statement of fact.

123. DSS's statements to Betta on February 12 of the quantity of each product that was shipped to Wells Fargo are false statements of fact.

124. DSS's statements to Betta on February 13 of the quantity of each product that was shipped to Wells Fargo are false statements of facts.

125. DSS's statements to Betta on July 15, 2004 of the quantities of product that were shipped to APL are false statements of fact.

126. Each of these statements were made to Betta by DSS via electronic exchange, through shared computer files that Betta was able to access through DSS.

127. Each of these statements were made by an employee of DSS, although Betta is unable to identify exactly which DSS employee made the statements, Betta will obtain this information through discovery.

128. Each of these statements was made to Betta's employees, including Dana McCurnin, Summer Beckwith, Dennis Walsh, Thomas Tyler, Carrie Sullivan, Dara Kinsman, and Dawn Wetjen.

129. At the time these statements were made, DSS did not have reasonable grounds to know whether the statements were true.

130. Each statement was made to Betta with the intent that Betta would rely upon the misrepresentation.

131. Betta actually did rely upon DSS's reports, including the false reports.

132. Betta was damaged in the amount of at least $450,267.54 and in a final amount to be proven at trial.

## VIII.

## SIXTH CLAIM FOR RELIEF

(Betta and the Trust against DSS)

(Negligence)

133. Plaintiffs reallege and reassert all of the statements made in paragraph 1 through 132, *supra*.

134. DSS owed a duty to Betta to keep accurate and complete records of all transactions of Betta products into and out of the warehouse.

135. DSS's duty arises from the Contract that both parties signed, and/or under applicable law.

136. DSS breached its duty to provide accurate records and accounting when it over reported or underreported any of the shipments of Betta product.

137. DSS owed a duty to Betta to safely store the Product and to deliver the Product upon Betta's demand.

138. DSS's duty arises from the bailment relationship between Betta and DSS and/or from the Contract.

15
AMENDED COMPLAINT
BPI 0048

139. DSS breached its duty to safely store and deliver the Product upon demand when it failed to deliver all of the Product to either Wells Fargo or to Betta.

140. DSS's breaches of duty caused Betta to be harmed because Betta relied upon DSS's reports in making its decisions to sell certain items to customers and in deciding to purchase more product from its manufacturers.

141. DSS's breach of duty caused Betta to be harmed because Betta was not able to sell or otherwise receive the benefit of the Products that were not delivered to either Wells Fargo or to Betta.

142. If DSS had kept accurate records, Betta would have been able to better sell its products and Betta would not have needed to purchase additional goods from its manufacturers.

143. If DSS had delivered all of the demanded pre-petition Product to Wells Fargo in January 2004, Wells Fargo would have been able to sell the pre-petition Product.

144. If DSS had delivered all of the demanded post-petition Product to Betta by May 31, 2004, Betta would have been able to sell the post-petition Product.

145. Betta has been harmed by this negligence in the amount that Betta would have been able to sell to its customers, and the expense of buying products from manufacturers when Betta did not need to buy any more product.

146. Betta has been harmed by DSS's negligence in the amount of at least $450,267.54 and in an amount to be determined at trial.

## IX.

## SEVENTH CLAIM FOR RELIEF

(Betta against DSS)

(Turnover of property of the estate)

(11 U.S.C. §542)

147. Plaintiffs reallege and reassert all of the statements made in paragraph 1 through 146, *supra*.

148. DSS was not a custodian of any of the property of the bankruptcy estate, as the term "custodian" is defined under 11 U.S.C. §101(11).

149. DSS had or has possession, custody, and control over property of the estate that the Debtor could have used, sold, or leased under 11 U.S.C. §363.

150. DSS has not delivered to the Debtor, or given an accounting to the Debtor, of the property of the estate that was or is in DSS's possession, custody, and control from April 15, 2003 through May 31, 2004.

151. The value of the property that was in DSS's possession, custody, and control from April 15, 2003 through May 31, 2004 was of significant value and benefit to the estate, and is valued in the amount of at least $345,412.81 and in a final amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1. Damages for Conversion for actual damages in the amount of at least $450,267.54 and in a final amount to be proven at trial; and for consequential and punitive damages arising from DSS's acts of conversion, including attorneys' fees;

2. Damages for DSS's breach of a bailment agreement in the amount of at least $450,267.54 and in a final amount to be proven at trial;

3. Damages for the fraud DSS committed against Betta in the amount of at least $450,267.54 and in a final amount to be proven at trial;

4. Punitive damages for the fraud DSS committed against Betta in an amount sufficient to deter future conduct;

5. Damages for the negligent misrepresentation committed against Betta in the amount of at least $450,267.54 and in a final amount to be proven at trial;

6. Damages for DSS's negligence that harmed Betta in the amount of at least $450,267.54 and in a final amount to be proven at trial;

7. Damages for DSS's failure to turnover property of the bankruptcy estate in the amount of at least $345,412.81 and in a final amount to be proven at trial; and,

8. Any other relief that the Court determines is necessary.

Respectfully submitted,

BRINKMAN PORTILLO, PC

Laura J. Portillo
Special counsel to Betta Products Inc. and Special counsel to the Betta Products Litigation Trust

18

AMENDED COMPLAINT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

The undersigned certifies and declares as follows:

I am employed in the City of Westlake Village and County of Los Angeles, in the State of California. I am over the age of 18 and not a party to the within action. I am employed by Brinkman Portillo, P.C. whose business address is 4333 Park Terrace Drive, Suite 205, Westlake Village, California 91361.

On **October 9, 2006**, I served the forgoing documents described as:

**PLAINTIFF'S MOTION FOR: 1) MODIFICATION OF THE STAY PENDING ARBITRATION; 2) LEAVE TO AMEND THE COMPLAINT; MEMORANDUM IN SUPPORT**

on the interested parties in this action
[X] by placing [] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

[X] **BY OVERNITE EXPRESS**
Mitchell Greenberg
Abbey, Weitzenberg, Warren & Emery
100 Stony Point Rd., #200
P.O. Box 1566
Santa Rosa, CA 95401

[X] **BY EMAIL**
James A. Beitz
Hagerty Johnson & Beitz PA
701 Fourth Avenue South, Suite 700
Minneapolis, MN 55415
tbeitz@hjab.com

[X] **BY MAIL**
United States Trustee's Office
235 Pine Street, Ste 700
San Francisco, CA 94104

[X] I deposited such envelope in a United States Postal Service drop box at Westlake Village, California. The envelope was mailed with postage thereon fully prepaid.
[X] I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with a United States Postal Service drop box on that same day with postage thereon fully prepaid at Westlake Village, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit of mailing in affidavit.
[X] (**Federal**) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
Executed on **October 9, 2006**, at Westlake Village, California.

Luis Carmona

**BPI 0052**