EXHIBIT "3"

BPI 0053

1  Daren R. Brinkman (State Bar No. 158698)
2  Laura J. Portillo (State Bar. No. 186813)
   BRINKMAN PORTILLO, PC
3  4333 Park Terrace Drive, Suite 205
   Westlake Village, CA 91361
4  Telephone: (818) 597-2992
   Facsimile: (818) 597-2998
5
6  Special Counsel to Betta Products Inc.

7
8                  UNITED STATES BANKRUPTCY COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
10                       SANTA ROSA DIVISION

11 In re:                              ) Bankruptcy Case No. 03-10925 AJ
12 BETTA PRODUCTS, INC., a California  ) Chapter 11
   Corporation                         )
13                                     ) Adversary No. 05-01046
14                                     )
                    Debtor.            )
15 ─────────────────────────────────   ) DECLARATION OF CHRISTINA
16 BETTA PRODUCTS, INC., the Debtor in ) ERICKSON IN SUPPORT OF
   Possession,                         ) PLAINTIFF'S MOTION FOR 1)
17                                     ) MODIFICATION OF THE STAY
                    Plaintiff,         ) PENDING ARBITRATION; 2) LEAVE
18 v.                                  ) TO AMEND THE COMPLAINT
19 DISTRIBUTION SYSTEMS AND            )
   SERVICES, INC., aka DSS,            ) Date:   TBA
20                                     ) Time:   TBA
                                       ) Place:  99 South E Street
21                  Defendant.         )         Santa Rosa, CA
22                                     )
23                                     )
                                       )
24
25 I, Christina Erickson, declare as follows:
26     1.     I am an attorney duly admitted to practice in the State of California.
27
28
                                    1
   ─────────────────────────────────────────────────────────
   DECLARATION OF CHRISTINA ERICKSON IN SUPPORT OF MOTION
                     TO MODIFY THE STAY
                                              **BPI 0054**

2.      I am an associate at Brinkman Portillo, PC ("BP"), and maintain an office for the practice of law at 4333 Park Terrace Drive, Suite 205, Westlake Village, California.

3.      I have personal knowledge of the facts set forth herein and, if called upon to do so at trial, could and would competently testify thereto.

4.      BP represents Betta Products, Inc., ("Betta") the Plaintiff in this adversary action.

5.      Dennis Walsh is the Chief Executive Officer of Betta and has been the primary contact between BP and Betta.

6.      Dennis Walsh faxed a document entitled "Agreement" to my office and represented to me that the "Agreement" was a true and correct copy of the contract between Betta and DSS. A true and correct copy of the "Agreement" is attached to this declaration as Exhibit A.

7.      BP filed a claim for arbitration on behalf of Betta and the Betta Products, Inc. Litigation Trust (the "Trust") with the American Arbitration Association ("AAA").

8.      At the request of the impaneled arbitrators, BP served a document entitled "Specification of Claims" on defendant DSS, AAA, and the impaneled arbitrators. A true and correct copy of the "Specification of Claims" is attached to this declaration as Exhibit B.

9.      From the time that BP substituted in as counsel to the present date, BP has been in continual communication with Betta to assemble and examine the documents and the testimony that support Betta's claims.

10.     BP received several shipments from Betta of documents related to this adversary proceeding and arbitration.

11.     I received a shipment of boxes from Betta on May 3, 2006, containing Betta's files of receiving documents, and Betta records of shipments that left the DSS warehouse.

2

12.    I received a shipment of boxes from Betta on April 19, 2006, containing shipping documents showing the Betta product that was sent to the DSS warehouse for storage and distribution.

13.    I received a shipment of boxes from Betta on April 4, 2006, containing invoices and related payment documents, and correspondence between Betta and DSS.

14.    In the arbitration proceeding, respondent DSS has filed a "Motion to Dismiss All or Part of Betta's Claims."

15.    On September 15, 2006 another attorney at my office forwarded to me an email from counsel for DSS, James A. Beitz, that contained the Motion to Dismiss All or Part of Betta's Claims as an exhibit.

16.    Attached to this declaration as Exhibit C is a true and correct copy of the forwarded email and the Motion to Dismiss All or Part of Betta's Claims that was attached to the forwarded email.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on October 9, 2006 in Westlake Village, California.

Christina Erickson

3

DECLARATION OF CHRISTINA ERICKSON IN SUPPORT OF MOTION
TO MODIFY THE STAY

**BPI 0056**

# EXHIBIT A

BPI 0057

10/18/2005  11:34    7074317795                    ORDER ENTRY                    PAGE

# AGREEMENT

This Agreement, made this 1st day of May, 1996, is between Betra Products, Inc. ("Supplier"), with its principal place of business at 3451 Lunar Court, Oxnard, California 93030, and Distribution Systems & Services Corporation (DSS) with its principal place of business at 4440 Round Lake Road West, St. Paul, Minnesota 55112.

## WITNESSETH:

**WHEREAS,** Supplier desires to engage DSS to perform the work described in this Agreement under terms and conditions of this Agreement; and

**WHEREAS,** DSS desires to perform the work described in this Agreement for Supplier under the terms and conditions of this Agreement;

**NOW, THEREFORE,** for and in consideration of these premises, the mutual covenants and promises hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows.

1. **DEFINITIONS.** For the purpose of this Agreement, the following words and phrases shall have the definitions set forth below:

    (a)    "Agreement" shall mean this document;

    (b)    "Customer(s)" shall mean all customers who order Supplier's Products directly from Supplier or DSS on behalf of Supplier pursuant to this contract;

    (c)    "Net Amounts" shall mean the total of the amounts invoiced by DSS on the behalf of Supplier after subtracting all C.O.D. charges, freight charges, trade discounts, or other allowances, actually made with respect to such invoiced amounts and any internal and value-added taxes or taxes replacing or supplementing them in the future and any other taxes imposed later on the same taxable events; and

    (d)    "Product(s)" shall mean the Products listed in Exhibit A.

1

**BPI 0058**

## 2.   SCOPE OF WORK.

(a)   Except as provided in paragraph 2(b), DSS agrees to furnish and pay for all labor, supervision, taxes, equipment, supplies, and other related expenses necessary to perform the following duties:

(i)   Set up and maintain a finished goods warehouse, and product shipment operation for all Products.  This includes, but is limited to, the following:

    (1)   Provide a location for the finished goods warehousing and product shipment operation;

    (2)   Receive Products shipped from Supplier or its manufacturing vendor, verify that the quantity received equals the quantity indicated on the bill of lading, inspect the Products for damage, make timely claims for shortages and damaged goods to carriers or vendors on Supplier's behalf, report any discrepancies or damage to Supplier and hold the Products in inventory.  DSS to maintain acceptable real-time record of receipts to forty-eight (48) hours;

    (3)   Use reasonable efforts to store safely all Products received and 'to protect the Products from loss or damage;

    (4)   Pack and ship ordered Products or Product samples using carriers hired by DSS and approved by Supplier within a maximum of seventy two (72) hours of order receipt at DSS.  List of carriers will be provided to Supplier for prior approval;

    (5)   All freight bills will be sent directly to Supplier for payment by the Supplier;

    (6)   Receive and keep a separate record of returned goods, and provide monthly report of same.

(ii)   Organize and maintain an order processing department, which includes the following:

    (1)   Provide a location for the order processing department;

    (2)   Receive and process all orders for Products under the terms and conditions of sales set forth on Exhibit B;

    (3)   Prepare a bill of lading for each order using bill of lading forms supplied by DSS, formatted to Supplier's specifications or as provided by Supplier;

2

**BPI 0059**

(iii)   Order Entry/Processing

The flow of orders will be as follows:

-Betta Order Entry will input all orders.
-All orders will have detailed shipping and packing information as part of the detail.
-Daily DSS will pick up the orders. Orders entered before 12:00 are picked up at approx. 2:00. Orders entered after 12:00 are picked up at approx. 7:00 the next morning. Invoicing is sent to Betta (EDI) at 2:00.
-Orders picked up by noon will ship the following business day.
-DSS will fax an Order Log back to Betta listing all orders received.
-Betta Order Processing verifies all orders were received.
-Betta passes the shipping location.
-DSS faxes an Order Correction sheet to Betta Customer Service.
-DSS faxes Bill of Ladings and Manifests to Transportation and "transfer" packing documents to Renea. Order Correction logs and packing documents are faxed to Customer Service if shipped from MN, mailed if shipped from CA.
-Billing edits logs and invoices.

(iv)   Receiving

Betta will send to DSS a hard copy Receiving Document for all incoming freight. The R/D for domestic shipment will be sent (mailed) at the time the Betta Purchase Order is placed. Import shipment R/D's will be sent by Betta at the time of shipping advice from our freight carrier. This should be approximately 30 days prior to arrival of goods at DSS. (Minn will be approx. 45 days). The following procedure is followed for receiving.

1. All appointments are controlled by DSS in conjunction with Betta.
2. At delivery of goods the receiving department will count and verify carton counts against freight bills.
3. Clear freight bills are signed, logged and attached to the R/D.
4. Two random cartons are chosen and opened. A unit is removed from each carton and inspected for correctness of product. (I.E.: Blue candles if the package calls for blue.)
5. A test scan of the UPC code is made and verified against the R/I.)

(b)   Supplier will furnish and pay for the following services, personnel, equipment and supplies:

(i)   Pallets, cartons and packing material as needed.

(ii)   Provide proof of insurance coverage as required in Section 13 hereof.

3

**BPI 0060**

**3.    ADDITIONAL WORK.** If Supplier requests DSS to perform any work DSS considers to be beyond the scope of work described in Section 2(a) above ("Additional Work"), DSS shall have the right to accept or reject such request. In the event that Supplier shall request that DSS perform work pursuant to this Agreement which DSS believes constitutes Additional Work, then, before performing the work in question, DSS shall notify Supplier in writing that it believes the work in question to constitute Additional Work. Upon receipt of such notice, Supplier will evaluate the work in question and inform DSS in writing whether it believes the work constitutes Additional Work. If Supplier agrees that the work in question constitutes Additional Work, then Supplier and DSS shall negotiate the amount which DSS will be compensated for its performance of the Additional Work. If Supplier does not agree that the work in question constitutes Additional Work, then the questions of whether the contemplated work constitutes Additional Work shall be submitted to binding arbitration as herein provided and DSS will proceed with the work.

**4.    PAYMENT.**

    **(a)**   In consideration for performance of the duties specified in this Agreement, Supplier agrees to pay DSS the following compensation:

**Basic Services Pricing**

| | |
|---|---|
| Full case pick | $ .45 |
| Break case pick per line | $ .45 |
| Shipment preparation | $ 5.00 |
| Storage per cube per month | $ .20 per cubic foot per month |
| Miscellaneous Labor | $ 11.00 per hour MN - $9.50 per hour CA (Need to review hourly charges) |
| Pallet in/out charge | $ 5.00 per pallet (in tact - no break down) |
| Pallet inbound charge | $ 12.00 per pallet (floor load inbound) |
| Storage for close out product | $ 8.00 per pallet per month |
| Storage for cardboard & fixtures | $ 10.00 per pallet per month |

**Transfer Charges**
$ 9.50 per hour California
$11.00 per hour Minnesota                    (Both need to be reviewed)

**Variable Charges**
Quoted on an as needed bases for such things as special case labeling or special displays or prepacks.

    **(b)**   The compensation to be paid to DSS as provided for in Section 4(a), shall be due and payable by Supplier in full within fifteen (15) days of Suppliers' receipt of the bill.

    **(c)**   DSS may, at its discretion, limit services provided under this Agreement if Supplier's accounts payable to DSS become more than thirty (30) days past due, and DSS advises Supplier, in writing, of intent to limit services and in what manner. If Supplier's past due accounts payable to DSS are in dispute, DSS and Supplier will submit the dispute to binding Arbitration and DSS will continue to provide full scope of work service. If Supplier elects arbitration, then Supplier will deposit disputed amount in escrow account in a mutually agreeable bank or

4

**BPI 0061**

savings institution to be disbursed upon the decision in accordance with arbitrator's instructions.

(d)    Supplier hereby acknowledges and agrees that pursuant to Minn. Stat. S336.7-209, DSS shall have a warehouse lien on all goods stored by DSS for any and all charges and expenses owing under this Agreement, whether such charges and expenses were incurred in relation to goods in the possession of DSS at the time the lien is enforced or incurred in relation to goods no longer in the possession of DSS at the time the lien is enforced.

## 5.    RISK OF LOSS.

(a)    DSS is responsible for the safe handling and safekeeping of Products delivered to the warehouse location provided by DSS.  Except as provided in Section 5(b) below, if more than one half (½) of one percent (1%) of the Products received by DSS during any three month quarter during the Agreement term are lost, stolen, and/or damaged, then DSS agrees to reimburse Supplier for the value of the Products in excess of this amount on the following terms:

(i)    The quantities of Products lost, stolen and/or damaged shall be calculated when Supplier receives each physical inventory report from DSS;

(ii)    For the purpose of calculating the value of the Products which are lost, stolen and/or damaged, Supplier shall use the acquisition cost (as defined in Exhibit A and as periodically amended) of each Product.  If loss or damage is in excess of five percent (5%) of warehoused goods, DSS will be responsible for cost of goods so lost, stolen, or damaged at dealer net;

(iii)    DSS agrees to pay Supplier all amounts under this section within thirty (30) days after receipt of an invoice; and

(iv)    DSS shall comply with Supplier's instructions concerning the disposition of damaged Products.

(b)    Supplier agrees to insure, at its own expense, all Products in DSS's possession, for their full value against perils customarily covered under fire and extended coverage insurance with a vandalism and malicious mischief endorsement.  DSS shall not be responsible for any damage to or destruction of the Products in DSS's possession resulting from perils customarily covered by fire and extended coverage insurance.  If such damage or destruction occurs, Supplier agrees that it will rely solely upon its policies of insurance, and all claims against DSS arising out of such damage or destruction, including any right of subrogation by Supplier's insurance carrier, are hereby waived by Supplier.  Supplier also agrees that it will bring no action against DSS, its agents or employees for any claim arising out of such damage or destruction of any Products.  Supplier agrees to provide DSS with a certificate of insurance containing the restriction that the policy may not be terminated or canceled without thirty (30) days' prior written notice to DSS.  DSS agrees to notify Supplier of any loss or damage to Products within seventy-two (72)

5

BPI 0062

hours of discovery, and record such damage and take all possible steps to minimize additional damage.

(c)   DSS agrees to insure, at its own expense, all premises, equipment, supplies, and all other things furnished by DSS for their full value against perils customarily covered under fire and extended coverage insurance with a vandalism and malicious mischief endorsement. Supplier shall not be responsible for any damage to or destruction of the premises, equipment, supplies, or all other things furnished by DSS resulting from perils customarily covered by fire and extended coverage insurance. If such damage or destruction occurs, DSS agrees that it will rely solely upon its policies of insurance and all other claims against Supplier arising out of such damage or destruction, including any right of subrogation by DSS's insurance carrier, are hereby waived by DSS. DSS also agrees that it will bring no action against Supplier, its agents or employees for any claim arising out of such damage to or destruction of the premises, equipment, supplies or other things furnished by DSS for whatever reason or cause.

(d)   Nothing contained herein shall be construed as making DSS liable for any claim arising out of the manufacture, safety or design of the Product or as absolving Supplier from its responsibility to indemnify DSS and hold DSS harmless, as provided in Section 12 hereof.

6.   **INSPECTION.** At any time during normal working hours after giving DSS reasonable prior notification, Supplier may inspect the warehouse locations provided by DSS and any work in progress, and audit any records, files, and financial transactions which DSS is obligated to maintain under this Agreement.

7.   **SUPPLIER/DSS IDENTIFICATION.** DSS will use reasonable efforts to structure all communication to the Supplier's Customers in such a manner as to remain transparent to the Customer. This will include telephone communication, correspondence, invoicing and any other Customer communication that the Supplier deems necessary.

8.   **CONFIDENTIALITY.**

(a)   Each party understands and acknowledges that Confidential Information will be disclosed to it while it is performing this Agreement. "Confidential Information" means information not generally known to the public and proprietary to a party, including but not limited to, trade secret information about processes, Products, research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, leasing, servicing, financing, business systems, techniques, and operations, and information concerning the contents of this Agreement, the identities of Customers and the sales and shipments made to Customers. Except as required to perform this Agreement, both parties agree not to use or disclose any Confidential Information during the term of the Agreement or thereafter. Upon termination of this Agreement, all records and any other items which disclose or embody Confidential Information, including all copies, will be returned to the party which owns the Confidential Information.

6

BPI 0063

10/18/2005  11:34   7074317795                    ORDER ENTRY                         PAGE

(b)   Each party's obligations under this section do not, however, apply to any information which:

   (i)   Is in the public domain at the time the party learns of it, or becomes publicly known through no wrongful act of that party; or

   (ii)   Is in the public domain at the time the party learns of it, or becomes publicly known through no wrongful act of that party; or

   (iii)   Is received by a party from a third party which had a lawful right to disclose it to that party; or

   (iv)   Is used or disclosed by a party with the prior written approval of the other party.

   (v)   Is compelled to be disclosed by the courts or any governmental agency.

**9.   OWNERSHIP OF PROPERTY.** DSS acknowledges that the Products delivered to DSS and all documents received and created by DSS while performing work under this Agreement (including, but not limited to, orders, bills of lading, invoices, correspondence, reports, files, and records) are the property of Supplier. DSS agrees to execute a UCC-1 financing statement (to be filed by Supplier in the office(s) of the appropriate Secretary of State) as an acknowledgement that such property in the care, custody, and control of DSS is owned by Supplier. DSS shall not sell, transfer, or remove this property from DSS's location(s) except to Customers in the ordinary course of business or upon written instruction from Supplier.

At the termination of this Agreement, DSS shall promptly return all of the property owned by Supplier to Supplier. If Supplier wishes to prepare the property for shipment and remove the property, then Supplier shall have the right to peaceably enter DSS's location(s) during normal business hours to prepare and remove the property. Upon reasonable request by Supplier, DSS shall prepare the property for shipment and return the property to Supplier at Supplier's expense.

**10.   DSS EMPLOYEES.** DSS agrees to maintain such work force as it deems appropriate to perform the work specified under this Agreement. DSS acknowledges that no workers' compensation insurance, unemployment insurance, pension plans, health insurance, life insurance or other benefits and protections made available to employees of Supplier will apply to DSS employees and agents, and that Supplier will not withhold from the monies it pays DSS any money for state and federal income taxes, social security taxes, unemployment tax, workers' compensation taxes, or any other payroll taxes owed by DSS to the government except if an appropriate government agency places a lien at Supplier against DSS for funds owed the government.

**11.   LIENS.** Except as provided in Section 15(d) and Section 4d, DSS agrees to use its best efforts to prevent any lien, claim of lien or other encumbrance from being asserted against Supplier or Supplier's property.

BPI 0064

12.  **INDEMNIFICATION.**

    (a)  DSS will indemnify and hold harmless Supplier and its directors, officers, agents, and employees, from any loss, claim, liability, and expense (including reasonable attorney's fees and other expenses of litigation) with respect to claims arising out of any act or omission wholly or partly attributable to DSS, its employees, or its agents, delegates or subcontractors, or to any work performed by DSS under this Agreement. Nothing herein shall create an obligation by DSS to indemnify or hold harmless the Supplier, its directors, officers, agents, and employees with respect to claims based on Products.

    (b)  Supplier will indemnify and hold harmless DSS and its directors, officers, agents and employees, from any loss, claim, liability, and expense (including reasonable attorney's fees and other expenses of litigation) with respect to claims based on Products partly or wholly on an act or omission of Supplier or its employees.

13.  **INSURANCE.**

    (a)  DSS agrees to obtain and maintain at all times throughout the term of this Agreement the following Insurance:

        (i)  Comprehensive General Liability Insurance with limits totaling at least One Million Dollars ($1,000,000.00) per occurrence for property damage. DSS will not be required to insure Products in DSS's warehouse - this is the obligation of Supplier.

        (ii)  Workers Compensation with limits as required by law; and

        (iii)  Employers' Liability Insurance, with a minimum limit of One Million Dollars ($1,000,000.00) per accident.

    (b)  Supplier will purchase and maintain Product Liability Insurance of at least One Million Dollars ($1,000,000.00) naming DSS as additional insured.

    (c)  The terms used in Section 13 above to specify the required insurance are to be interpreted according to ordinary usage in the insurance industry. The policies obtained and maintained to provide the specified insurance must provide that the required coverages and limits cannot be canceled or changed without at least thirty (30) days prior written notice to Supplier or DSS.

    (d)  Both parties will provide each other insurance certificates showing compliance with the insurance specifications stated in Section 13 (a) and (b) above.

14.  **LIMITATION OF LIABILITIES.** EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN SECTION 5 (RISK OF LOSS) AND SECTION 12 (INDEMNIFICATION), NEITHER PARTY SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, REVENUE OR BUSINESS) RESULTING FROM OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE TERMINATION OR

BPI 0065

10/18/2005  11:34     7074317795                    ORDER ENTRY                                    PAGE  18

NONRENEWAL OF THIS AGREEMENT OR ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT OR BREACH OF ANY PURCHASE ORDERS ACCEPTED PURSUANT TO THIS AGREEMENT. This exclusion applies, regardless of whether such damages are sought based on breach of warranty, breach of contract, negligence, strict liability in tort, or any other legal theory. This exclusion does not apply to claims for personal injury by a third party.

## 15.  TERM: TERMINATION.

(a)  The term of this Agreement shall commence on May 1, 1996, and shall continue for three (3) years. Thereafter, the term of this Agreement shall be automatically extended for additional twelve (12) month periods unless terminated in writing by either party at least 180 days prior to the end of the original period or any additional period, as the case may be.

(b)  Notwithstanding the language of Section 15 (a), this Agreement may be terminated with cause by either of the parties in the event of a material breach by the other party of its obligations under this Agreement. Any party intending to terminate under this section shall give written notice of its intention to the other party, stating its rationale and giving a detailed description of the cause. The notice shall be sent registered or certified mail, return receipt requested. The party giving notice shall grant the other party thirty (30) days in which to remedy the cause for termination. During this period to cure, the parties shall make a good-faith effort to assist one another to remedy the breach. If the breach is not remedied by the end of the period to cure, then the Agreement shall be terminated effective as of the last day of the period to cure.

(c)  This Agreement may be terminated without cause by Supplier at any time during the extended term of the Agreement by giving DSS written notice, sent registered or certified mail, return receipt requested, at least ninety (90) days prior to the desired date of termination.

(d)  Notwithstanding the restriction on liens contained in Section 11, hereof, as of the date of receipt of a notice of termination, DSS is hereby granted a lien on Products in its possession for all amounts due on the date of termination under this Section.

(e)  This Agreement may be terminated without cause by DSS at any time during the extended term by giving Supplier written notice, sent registered or certified mail, return receipt requested, at least ninety (90) days prior to the desired date of termination.

(f)  Termination of this Agreement shall not terminate any financial obligations or debts incurred under this Agreement or any obligation to pay in the event of a termination without cause or any liens created hereby. The confidentiality provisions of Section 8 and the indemnification provisions contained in Section 12 shall survive the termination of this Agreement.

9

**BPI 0066**

16.    **NOTICE**

   (a)    Except as otherwise expressly provided herein, any notice given under the terms of this Agreement will be in writing and will be deemed duly given when delivered personally or when sent by registered or certified U.S. Mail to the address specified herein or to such other address specified in writing.  A notice so sent will be deemed to have been received on the next business day subsequent to mailing.

Notice to DSS:                    **DISTRIBUTION SYSTEMS &**
                                  **SERVICES CORPORATION**
                                  4440 Round Lake Road West
                                  St. Paul, Minnesota 55112
                                  Attention:  Tim Scholl
                                           Dave Smith

Notice to Supplier:               **BETTA PRODUCTS, INC.**
                                  3451 Lunar Court
                                  Oxnard, California 93030
                                  Attention: Mr. Richard Shindle

17.    **EXCLUSIVITY.**  During the term of this Agreement, Supplier agrees that it will not use any other company to provide the services DSS is obligated to perform under this Agreement with respect to the sale of the specified line of Products to Customer.  DSS also agrees that it will not perform similar services for any company selling products which compete directly with suppliers products during the term of this agreement without prior written consent of suppliers.  Upon notice of termination, this paragraph shall become non-effective.

18.    **FORCE MAJEURE.**  If the performance of any of the duties provided in this Agreement other than the payment of funds is prevented, restricted, or interfered with by reason of fire, earthquake, or other casualty or accident; inability to procure raw materials, power or supplies (for reasons other than DSS's negligence or fault or failure to order timely); war or other violence; any law, order, proclamation, regulation, ordinance, demand or requirement of any government agency, court or intergovernmental body; or any other act or condition whatsoever beyond the reasonable control of the parties hereto; then the party so affected, upon giving notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference; provided that the party so affected shall use its best effort as to avoid or remove such causes of nonperformance and shall continue performance hereunder with the utmost dispatch whenever such causes are removed.

19.    **ARBITRATION.**  Any disagreement or dispute arising under this Agreement between the parties may be submitted by either party to binding arbitration in St. Paul, Minnesota, under the rules of the American Arbitration Association then in effect.  Upon written notice of demand for arbitration of any matter relating to this Agreement the party receiving such notice shall be deemed

BPI 0067

to have agreed to such arbitration, and such matter shall no longer be subject to the jurisdiction of any court, except to enter judgement of any decision of the arbitrator.

20.   **INDEPENDENT CONTRACTOR.**  DSS warrants and agrees that in all transactions relating to this Agreement it is an independent contractor. This Agreement does not and will not be construed to create a partnership or joint venture between the parties. Neither party shall have any authority to obligate or to otherwise act as representative of, or agent for, the other party for any purpose, and neither party shall make any representation or hold itself out as having such authority.

21.   **ASSIGNMENT.**  Neither party shall assign this Agreement nor any rights, benefits, or duties under this Agreement without the prior written consent of the other party not to be unreasonably withheld.

22.   **MISCELLANEOUS.**

(a)   No change, amendment or modification of this Agreement shall be effective unless it is reduced to writing and signed by both parties.

(b)   This Agreement constitutes the entire agreement between the parties relating to the matters set forth herein and supersedes all prior agreements, whether written or oral, and all other communications between the parties relating to the subject matter of this Agreement and shall prevail over any contradictory terms and conditions in any purchase order, acceptance, acknowledgment or other standard forms used by the parties in performing this Agreement.

(c)   No waiver of any breach of this Agreement will be construed as a continuing waiver or consent to any subsequent breach of the Agreement.

(d)   This Agreement will be construed in accordance with the laws of the State of Minnesota, and the parties to this Agreement agree to submit to the jurisdiction of the Courts of the State of Minnesota.

(e)   This Agreement will be binding upon and inure to the benefit of the parties' respective successors and assigns.

(f)   In the event any provision of this Agreement is held to be illegal or unenforceable for any reason, the validity or enforceability of the remaining provisions will not be affected.

(g)   Section headings are provided for convenience only. They do not modify or effect the meaning of any provision herein and will not serve as a basis for interpretation or construction of this Agreement.

BPI 0068

ORDER ENTRY                                    PAGE  1

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

BETTA PRODUCTS, INC.

By _____
Its _____

DISTRIBUTION SYSTEMS & SERVICES CORPORATION

By _____
Its _____

*12*

BPI 0069

**EXHIBIT A**

**Price Sheet**

13

BPI 0070

**EXHIBIT B**

**Credit Policy**

14

# EXHIBIT B

**BPI 0072**

**Tina Erickson**

| | |
|---|---|
| From: | Laura Portillo [laura_portillo@brinkmanlaw.com] |
| Sent: | Friday, September 15, 2006 7:28 AM |
| To: | Daren Brinkman; Tina |
| Subject: | Fw: Betta/DSS |

Attachments:    042.2 Motion to Dismiss.doc; 042 JAB Affidavit.doc; 043 Ltr. Panel (enc.motion.).doc; 044 Ltr. Portillo (enc. motion).doc

      

042.2 Motion to Dismiss.doc (7...     042 JAB Affidavit.doc (16 KB)     043 Ltr. Panel (enc.motion.).d...     044 Ltr. Portillo (enc. motion...

Sent via BlackBerry from T-Mobile

-----Original Message-----
From: Tony Beitz <tbeitz@hjab.com>
Date: Fri, 15 Sep 2006 08:53:50
To:"Laura Portillo" <laura@brinkmanlaw.com>
Subject: Betta/DSS

Dear Ms. Portillo,

I am attaching my cover letter to the panel, my cover letter to you, DSS's Motion to Dismiss, and my accompanying affidavit, all of which I served on you by US Mail today, together with the exhibits to my Affidavit.

James A. Beitz
Hagerty Johnson & Beitz PA
701 Fourth Avenue South, Suite 700
Minneapolis, MN 55415
(612) 349-9000
(612) 332-3751 (fax)

This e-mail and any files transmitted with it are the property of Hagerty Johnson & Beitz P.A., and they contain confidential information which is privileged. The information is intended only for the use of the intended recipient named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail or its attachments except its direct delivery to the intended recipient named above is strictly prohibited. If you have received this e-mail in error, please notify us immediately by telephone at 612/349-9000 and delete/destroy this message and any attachments immediately.

**BPI 0073**

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between:

Betta Products, Inc., and The Betta
Products, Inc. Litigation Trust,
    Claimant,

and

Distribution Alternatives, Inc. f/k/a
Distribution Systems and Services
Corporation, d/b/a DSS,
    Respondent.

**No: 65 181 Y 00298 05**

**DSS's MOTION TO DISMISS ALL
OR PART OF BETTA'S CLAIMS**

**Arbitration Date: November 13 – 17, 2006**

Distribution Alternatives, Inc. f/k/a Distribution Systems and Services Corporation, d/b/a

DSS (hereinafter "DSS") moves to dismiss all or part of the claims against it with prejudice on

the grounds that (1) neither Betta Products, Inc. (hereinafter "Betta") nor The Betta Products, Inc.

Litigation Trust (hereinafter the "Trust") has standing to pursue those claims, (2) Claim Number

Two is not recognized under and is specifically prohibited by the contract upon which Betta and

the Trust (collectively "Claimants") rely, and (3) Claim Number Three and at least part of Claim

Number Five have been formally released for good consideration.

## ISSUES

1.      Whether the Trust may pursue claims irrevocably assigned to it as Representative

of the Estate of a Debtor where the Bankruptcy Court has specifically refused to grant the

Debtor's motion to convey "Representative Status" on the Trust?

2.      Whether Betta may pursue claims it has irrevocably assigned to the Trust?

3.      Whether either Claimant may pursue claims under the Betta/DSS Agreement for

"consequential damages" in light of the prohibition of consequential damages in

paragraph 14 of that Agreement?

**BPI 0074**

4.      Whether either Claimant may pursue claims as ~ ned to Betta by Wells Fargo

Bank for alleged overcharges for services by DSS to Wells Fargo when Wells Fargo has

made a Settlement and Release Agreement with DSS in which it "forever releases and

discharges" DSS from all claims that DSS "overcharged Wells for services and

materials?"

5.      Whether Claimants may maintain claims for common law conversion and

bailment under an arbitration agreement between Betta and DSS to arbitrate "any

disagreement or dispute under this Agreement"?

### DOCUMENTS COMPRISING THE RECORD

1.      Betta Products, Inc. First Amended Chapter 11 Plan of Reorganization, confirmed

May 17, 2004 (the "Plan"), attached as Exhibit A to the Affidavit of James A. Beitz;

2.      April 6, 2005, Betta Products, Inc. Litigation Trust Agreement ("Trust

Agreement"), Exhibit B to the Beitz Affidavit;

3.      April 8, 2005, Joint Motion to Authorize Transfer of Representative of Estate

Status From The Debtor to Trustee of Liquidating Trust of Betta Products, Inc. (the "Motion"),

Exhibit C to the Beitz Affidavit;

4.      April 15, 2005, transcript of proceedings of the Motion, Exhibit D to the Beitz

Affidavit;

5.      May 1, 1996, Agreement between DDS and Betta, Exhibit E to the Beitz

Affidavit;

6.      September 30, 2004, Settlement and Release Agreement between DSS and Wells

Fargo Bank, Exhibit F to the Beitz Affidavit;

7.      Pages 7, 17-8, 24-5, 47, 59, 61-5, 124-25, 145, 175-76, 194, 199-200 from the

July 18, 2006, deposition of Dana McCurnin, Exhibit G to the Beitz Affidavit; and

8.      Pages 8, 122-23, 135, 146 from the July 18, 2006, deposition of Dennis Walsh,

**BPI 0075**