Exhibit H to the Beitz Affidavit.

This motion is further based upon the Beitz Affidavit and the following Points and Authorities in Support of DSS's Motion to Dismiss.

## UNDISPUTED FACTS

1. Betta and DSS did business together under the terms of the May 1, 1996, Agreement. Exhibit E.

2. Betta filed for protection under Chapter 11 of the United States Bankruptcy Code on or about April 15, 2003. Exhibit A, Section 1.14, at 3.

3. Wells Fargo Bank was a secured creditor of Betta at the time of Betta's filing and during the Betta bankruptcy proceeding. Exhibit A, Section 3.03, at 4.

4. DSS continued to provide warehouse and distribution services to Betta during the period of time Betta was in bankruptcy. Beitz Affidavit, ¶ 3.

5. On or about July 11, 2003, Betta abandoned its pre-petition inventory to Wells Fargo Bank. Beitz Affidavit, ¶ 4.

6. Wells Fargo continued to store some or all of its share of the inventory in DSS's warehouse until on or about January 28, 2006. Beitz Affidavit, ¶¶ 5, 6.

7. Wells Fargo ordered its share of the inventory shipped out of the DSS warehouse on various occasions between July 11, 2003, and on or about January 28, 2004. Beitz Affidavit, ¶ 6.

8. Wells Fargo and DSS had various disagreements about charges DSS billed Wells Fargo for inventory storage and other services, and they settled those differences under the terms of the September 30, 2004, Settlement and Release Agreement. Exhibit F.

**BPI 0076**

9. Betta terminated its relationship with DSS on or about May 2004, and removed or took delivery of the remainder of its inventory from DSS at that time. Exhibit G at 24-5.

10. Betta was discharged from bankruptcy in accordance with the terms of the Plan on or about May 17, 2004. Exhibit B at 1.

11. The Plan reserved to Betta the right to pursue "[c]laims and rights of set off against Distribution Systems and Services Corp. arising from the warehousing agreement dated May 1, 1996, payments, overcharges, lost and damaged goods, and claims assigned pursuant to the Compromise Agreement." Exhibit A, section 7.04 at 7.

12. Betta and others formed the Trust on or about April 6, 2005, and transferred to it irrevocably Betta's claims against DSS "under various legal theories related to breach of contract and the loss or conversion of Betta's inventory and other property under the warehouse relationship between Betta and DSS." Exhibit B at 1, 3, 5.

13. The transfer of claims was made to the Trust as "a representative of Betta appointed by the Bankruptcy Court for such purposes within the meaning of section 1123 (b) (3) of the Bankruptcy Code." *Id.* at 10.

14. Betta formally asked the Bankruptcy Court to "authorize the transfer of the 'Representative of the Estate' status from the Debtor [Betta] to the Trustee of the Betta Products Litigation Trust ('Trust') for purpose of litigating certain causes of action [including the claims against DSS] for the benefit of the Estate's creditors." Exhibit C at 1-2.

15. The Bankruptcy Court refused Betta's request to transfer Representative of the Estate status under section 1123 (b) (3) of the Bankruptcy Code to the Trust. Id. at 2, 5.

16. Claimant's Claim Number Two seeks consequential damages in the form of revenues allegedly lost due to DSS's misplacing certain inventory for a period of time. Exhibit G at 176.

**BPI 0077**

## INTRODUCTION AND PROCEDURAL HISTORY

Betta and DSS did business together starting in 1996 under the terms of the Betta/DSS Agreement, by which DSS acted as Betta's primary warehouse and distribution center. As part of the distribution work both parties maintained daily computer or "perpetual" counts of Betta's inventory of goods in DSS's warehouse. Each year until 2003 the parties performed a year end physical count of the inventory and conformed their respective perpetual inventory counts to the physical count. McCurnin Deposition, Exhibit G at 47, 59.

Betta petitioned for relief to the United States Bankruptcy Court for the Northern District of California under Chapter 11 of the Bankruptcy Code April 15, 2003. Wells Fargo Bank was its largest if not only secured creditor. Betta continued business as usual with its customers and with DSS following its filing. It continued to receive and route customer orders to DSS for distribution.

On July 11, 2003, Betta abandoned its pre-petition goods to Wells Fargo, and Wells Fargo set about to liquidate that inventory. Various disputes about inventory and storage charges arose among Betta, DSS, and Wells Fargo between July 11, 2003, and the first half of 2004, when Wells Fargo completed its liquidation and Betta terminated its contract with DSS. Wells Fargo and DSS settled their dispute about alleged overcharges under the terms of their 2004 Release and Settlement Agreement, Exhibit F. The inventory disputes were not resolved. Wells Fargo contended that it did not receive by January 28, 2004, the closing date for the sale of the pre-petition goods, all of the pre-petition goods to which it was entitled. Betta contended that it did not receive all of the post-petition goods to which it was entitled. Both Betta and Wells Fargo relied exclusively on perpetual inventory counts to arrive at the amount of inventory that thought they had coming. Walsh Deposition, Exhibit H at 122-23, McCurnin Deposition, Exhibit G at

**BPI 0078**

124-25. However, all parties understood and conceded that the perpetual inventory systems were flawed and almost always inaccurate. *E.g.*, McCurnin Deposition, Exhibit G at 61-5. Moreover, Betta'a alleged shortage calculation counted only the shortages and intentionally omitted the overages shown on the perpetual inventories on which it relies. *Id.*, at 145.

Betta was discharged under the terms of the Plan May 17, 2004. The Plan reserved to Betta various claims, including ones made in this arbitration. On April 6, 2005, Betta formed the Trust and irrevocably assigned to the Trust the claims made in this arbitration. It sought Bankruptcy approval of the transfer of representative status to the Trust but was denied on April 15, 2005. Betta sued DSS April 13, 2005, in an adversary proceeding in the Bankruptcy Court in the Northern District of California for the claims it is making now, and the Bankruptcy Court, on July 11, 2005, ordered that case to arbitration under the arbitration agreement between Betta and DSS. Betta and the Trust then commenced this arbitration.

**ARGUMENT**

### I. BETTA ASSIGNED ITS CLAIMS AGAINST DSS TO THE TRUST, BUT THE TRUST LACKS THE AUTHORITY TO PURSUE THEM.

Betta's assignment of its claims to the Trust was "irrevocable." *See* Trust Agreement, Recital B; section 2.6, Beitz Affidavit, Exhibit B. Therefore, the Trust now owns the Betta claims against DSS outright. However, the Trust is not a party to the Betta/DSS contract, is not in privity with DSS, and has no authority, contract, or right to arbitrate with DSS. *See* Betta/DSS Agreement, Beitz Affidavit, Exhibit E.

Moreover, it has no statutory authority to do so either. The Bankruptcy Code allows a plan to provide for enforcement of any class of claim by the debtor or a representative appointed for such purpose. *See* 11 U.S.C. §1123 (b) (3). The Plan, not the debtor unilaterally, must provide

**BPI 0079**

for such appointment. *See In re Sweetwater v. Robson*, 884 F.2d 1323, 1326 (10th Cir. 1989) (holding that the appointment of a representative of the estate under §1123(b)(3)(B) must be approved by the court, and may not be accomplished by a unilateral declaration of the debtor in possession); *see also In re Churchfield Management & Investment Corp. v. Kelly*, 122 B.R. 76, 81 (Nov. 16, 1990) (holding that a party who is neither the debtor nor the trustee but who seeks to enforce a claim must establish two elements: (1) that it has been appointed; and, (2) that it is a representative of the estate); *In re Resorts International, Inc.*, 145 B.R. 412, 474 (August 16, 1990) (holding that in order for a Litigation Trust to be valid pursuant to 1123(b)(3)(b) it must be approved by the Court).

The Trust Agreement, consistent with the statute, requires the Trust to pursue the claims as "'representative' of Betta appointed by the Bankruptcy Court for such purposes within the meaning of Section 1123 (b) (3) of the Bankruptcy Code." *See* Exhibit B, Art. IX. However, the Bankruptcy Court specifically refused to transfer that status to the Trust. *See* Motion and Transcript of Motion to Transfer Representative Status to the Trust, Beitz Affidavit, Exhibits C and D. The Plan is the final judgment in the Bankruptcy Action. *See id.* at 5. It reserved to Betta the right to pursue the claims. *See* Plan, Exhibit A § 7.04. When Betta assigned those claims to the Trust irrevocably and failed to amend the Plan or otherwise have the Trust appointed its representative, it created a "Catch 22" and placed the claims outside any authority to resolve. The Trust has no contract authority to arbitrate with DSS, and it has no authority from the Bankruptcy Court to deviate from the Plan requirement that Betta and Betta only pursue the claims. *See* 11 U.S.C. §1123 (b)(3); *see also* Transcript of Motion, Exhibit D. In the transcript of that hearing the Bankruptcy Court clarifies why it will not sanction a transfer of representative status to the Trust without an amendment to the Plan:

10 9 2006042.2

**BPI 0080**

> The Court: . . .I need you to point to me to exactly where in the plan it says this is going to happen.
>
> Mr. Chandler: The plan doesn't say that this is going to happen.
>
> The Court:     Well, I'm not going to do it then. If you—if you want to change something that wasn't contemplated by the plan, you amend the plan.
>
> Mr. Chandler: . . .And the creditors came up with this idea to come up with a litigation trust, put this litigation into this trust, and manage it so that the debtor doesn't have to manage it. . .
>
> The Court:     That's fine, but this is a Chapter 11 with a confirmed plan.
>
> * * *
>
> The Court:     And if you want me to change the plan I'll be happy to rule on it.
>
> * * *
>
> The Court:     . . .because when you have a confirmation of a Chapter 11 plan you have a final judgment in the case. This is not (sic) anything to do with case administration. The case is over, there's a final judgment. If the final judgment doesn't say what you want it to say, you amend the plan.

*Id.,* at 2-5. In refusing to sanction appointment of the Trust as representative of the Estate, the

Court was merely following the law. See In re Resorts International, Inc., 145 B.R. 412,

Betta did not amend the Plan, the Trust did not attain representative status, but Betta did

assign the claims irrevocably to the Trust. Therefore, Betta cannot pursue the claims because it

does not own them, and the Trust owns the claims but without any contract or court authority to

pursue them in this forum. They must be dismissed.

## II.  THE BETTA/DSS AGREEMENT SPECIFICALLY PROHIBITS RECOVERY OF THE CLAIM TWO CONSEQUENTIAL DAMAGES.

Dana McCurnin, the Trustee of the Trust and one of the two owners of Betta, McCurnin

Deposition, Exhibit G at 1, 17-8, confirmed that Claimants' Claim Number Two seeks to

recover revenues Wells Fargo allegedly lost "as a *consequence* of DSS not having the goods on

hand when Wells Fargo needed them" and then having "those goods later, but they were no

8

**BPI 0081**

longer any good to Wells Fargo because their buyer was gone." *Id.* at 176-77 (emphasis added).

The Betta/DSS Agreement, *see* Beitz Affidavit, Exhibit E at 8-9, precludes either party from

recovering consequential damages, including damages for lost profits or revenues.

> 14.    **LIMITATION OF LIABILITIES**. EXCEPT AS OTHERWISE
> SPECIFICALLY PROVIDED IN SECTION 5 (RISK OF LOSS) AND SECTION 12
> (INDEMNIFICATION), NEITHER PARTY SHALL, UNDER ANY
> CIRCUMSTANCES, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR
> CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF
> PROFITS, REVENUE OR BUSINESS) RESULTING FROM OR IN ANY WAY
> RELATED TO THIS AGREEMENT OR THE TERMINATION OR NONRENEWAL
> OF THIS AGREEMENT OR ARISING OUT OF OR ALLEGED TO HAVE ARISEN
> OUT OF BREACH OF THIS AGREEMENT OR BREACH OF ANY PURCHASE
> ORDERS ACCEPTED PURSUANT TO THIS AGREEMENT. This exclusion applies,
> regardless of whether such damages are sought based on breach of warranty, breach of
> contract, negligence, strict liability in tort, or any other legal theory.

*Id.* (Emphasis in original).

Since the damages Claimants seek in Claim Number Two are explicitly forbidden under

the Betta/DSS Agreement and since it is that Agreement under which Claimants seek to recover,

Claim Number Two must be dismissed.

## III.    WELLS FARGO RELEASED DSS FROM ALL LIABILITY FOR THE DAMAGES ALLEGED IN CLAIM THREE AND AT LEAST PART OF CLAIM FIVE.

Both McCurnin and Dennis Walsh, the CEO and the other owner of Betta. Id. at 7;

McCurnin Deposition at 17-8, confirm that all of Claim Three and part of Claim Five seek to

recover charges that DSS allegedly collected from Wells Fargo for inventory that DSS allegedly

never ultimately turned over to Wells Fargo. McCurnin Deposition, Exhibit G at 194, 199-200;

Walsh Deposition, Exhibit H at 135, 146.

However, Wells Fargo released DSS from liability for those claims in its 2004 settlement

agreement with DSS.

9

**BPI 0082**

RECITALS

A.   Distribution [DSS] has asserted that Wells [Fargo] became indebted to Distribution in the sum of $63,819 for services and materials provided to Wells in connection with the storage by Wells of certain products at warehouses of Distribution (the "Claim").

B.   Wells has disputed that it owes the Claim, and asserts that Distribution overcharged Wells for services and materials and therefore no sum or at most a reduced sum is due to Distribution (the "Offset Claim").

* * *

1.   <u>Incorporation of Recitals, Representations and Indemnity.</u> The foregoing recitals of facts are incorporated herein as the agreement of the parties, which facts are represented to be true and accurate.

* * *

4.   <u>Wells Release.</u> Wells hereby forever releases and discharges Distribution and each of its past, present and future partners, employers, employees, principals, agents, insurers, attorneys, affiliated corporations, and each of them, from the Offset Claim.

Wells Fargo/DSS Settlement and Release Agreement, Exhibit F at 1. Since Wells Fargo released all of its claims against DSS for alleged overcharges and since Claim Number Three is comprised exclusively of overcharge claims assigned Betta by Wells Fargo and Claim Five includes such claims, Claim Three and that part of Claim Five related to Wells Fargo assigned claims must be dismissed.

## IV.   CLAIMANTS' REQUESTS FOR RELIEF FOR CONVERSION AND BREACH OF BAILMENT ARE BEYOND THE SCOPE OF THE ARBITRATION AGREEMENT.

In Claims One and Two Claimants seek alternative relief for conversion and breach of a bailment relationship. Conversion is a tort claim, *see, e.g., Herrmann v. Fossum,* 270 N.W.2d 18, 20 (Minn. 1978), and while bailment is a form of contract claim, *see Wallinga v. Johnson,* 269 Minn. 436, 131 N.W.2d 216 (1964), Claimants are making their bailment claims here not under the Betta/DSS agreement, but as an alternative to it. Neither claim is justified under the

10/9/2006042.2

**BPI 0083**

Betta/DSS Agreement, which limits arbitration under the Agreement to "any disagreement or dispute under this Agreement." Therefore, those alternative claims must be dismissed.

## CONCLUSION

For the foregoing reasons, DSS respectfully requests that the Panel grant its motion for complete or partial dismissal.

Dated: October 9, 2006

**HAGERTY JOHNSON & BEITZ PA**

_____

James A. Beitz, Attorney ID #6233
Attorneys for Respondent DSS
701 Fourth Avenue South, Suite 700
Minneapolis, MN 55415
(612) 349-9000

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the ___ day of September, 2006, I served the foregoing Motion to Dismiss All or Part of Betta's Claims by emailing the same to Laura J. Portillo, Esq. at laura@brinkmanlaw.com and by depositing in the United States Mail, at the City of Minneapolis, a true and correct copy thereof, properly enveloped, with postage prepaid, and addressed to:

Laura J. Portillo, Esq.
Brinkman Portillo PC
4333 Park Terrace Drive
Suite 205
Westlake Village, CA 91361

_____

James A. Beitz

10.9.2006042.2

**BPI 0084**

EXHIBIT C

**BPI 0085**

Laura J. Portillo
4333 Park Terrace Drive, ste. 205
Westlake Village, CA 91361
(818) 597-2992
(818) 597-2998
laura@brinkmanlaw.com

American Arbitration Association

| | |
|---|---|
| Betta Products, Inc., and Dana McCurnin, Trustee of the Betta Products Litigation Trust,<br><br>Claimants,<br><br>v.<br><br>Distribution Systems and Services, Inc., aka Distribution Alternatives, Inc.,<br><br>Respondents. | Case Number: 65 181 Y 00298 05<br><br>Arbitrators:<br>Hon. Robert E. Bowen<br>Hon. Edward J. Parker<br>Robert L. DeMay<br><br>**SPECIFICATION OF CLAIMS AGAINST DSS** |

## FACTS COMMON TO ALL COUNTS:

1. Betta Products, Inc., ("Betta") is a California corporation.

2. Betta is a company that sells paper and party products to retail stores in the United States.

3. Betta does not make the paper and party products it sells, Betta hires manufacturing companies to make the products that it sells.

4. Distribution Systems and Services, Inc., ("DSS") is a company that performs warehousing services.

5. On May 1, 1996 Betta and DSS entered into a contract ("Contract").

6. In the Contract, DSS agrees to store the quantities of Betta products that are shipped to DSS, and DSS agrees to pack and ship Betta products according to information and requests sent to DSS by Betta.

**BPI 0086**

7.  In the Contract, Betta agrees to pay DSS for these services.

8.  On December 31, 2002, Betta sent employees to the DSS warehouses to observe a year-end physical inventory that was conducted by DSS employees.

9.  DSS employees physically located, counted and measured all of the boxes that Betta was storing at DSS's warehouse.

10. Betta employees spot checked the inventory by requesting to inspect certain boxes. Betta employees would open the boxes and count the products inside the boxes to make sure that the count was accurate.

11. After the physical inventory was completed, Betta continued to ship goods to and from the warehouse.

12. DSS sent a transaction report to Betta every time units were shipped or received.

13. Each time Betta shipped units to DSS a bailment was created.

14. On April 15, 2003, Betta filed for Chapter 11 bankruptcy relief in the Bankruptcy Court of the Northern District of California.

15. Everything in DSS's warehouse on April 15, 2003 was deemed pre-petition goods that belonged to the bankruptcy estate.

16. Everything that was shipped to DSS after April 15, 2003 belonged to the reorganized Betta and was post-petition goods.

17. Betta requested that DSS keep the goods separately but DSS failed to comply with this request.

18. Betta continued to pay the storage charges to DSS each month.

19. On July 11, 2003 Betta abandoned all of its pre-petition inventory to Wells Fargo, a creditor in the bankruptcy.

**BPI 0087**

20. After July 11, 2003 both Betta and Wells Fargo paid jointly for the storage charges incurred by keeping the goods at the DSS warehouse. Betta paid DSS for the storage charges of the post-petition goods (anything received after April 15, 2003), and Wells Fargo paid the storage costs of anything in the DSS warehouse on or before April 15, 2003.

21. On January 28, 2004, Wells Fargo sent a shipping agent to DSS's warehouse to pick up all of the pre-petition goods.

22. Wells Fargo had found a buyer for the pre-petition goods and wanted to sell the pre-petition goods.

23. DSS gave Wells Fargo fewer goods than the total of the pre-petition goods.

24. After January 28, 2004, Betta began to pay all of the rental charges for the goods being stored by DSS.

25. Betta discovered that not all of the pre-petition goods had been delivered to Wells Fargo because in March 2004, Betta requested an inventory count from DSS that showed that DSS was storing several units of pre-petition goods and was improperly charging Betta monthly rent to store those units.

26. On April 22, 2004, Betta completely pulled out of DSS's warehouses.

27. Betta demanded that DSS turnover all of the post-petition goods it had been storing, however, DSS did not deliver the expected amount of goods.

28. DSS delivered substantially fewer goods than what the records showed was owed to Betta.

29. DSS attempted to deliver several boxes of pre-petition goods that did not belong to Betta.

**BPI 0088**

30. Betta refused to take possession of goods that rightfully belonged to Wells Fargo.

31. Wells Fargo assigned to Betta the right to prosecute any and all of Wells Fargo's claims against DSS.

## CLAIMS ASSERTED AGAINST DSS

**Claim Number One:**
**DSS failed to deliver all of the Pre-petition goods to Wells Fargo**

32. On January 21, 2004, when Wells Fargo picked up all the pre-petition goods, DSS delivered a quantity of goods to Wells Fargo that was less than the total amount of goods in storage at DSS on April 15, 2003 (the pre-petition goods).

33. The total value of those undelivered units was at least $530,005.05, but in a final amount to be determined after discovery and as shown at the evidentiary hearing.

34. Wells Fargo had a buyer lined up on January 28, 2003, who was prepared to buy the full quantity of the pre-petition goods.

35. The buyer purchased everything that Wells Fargo obtained from DSS, which was a quantity less than the total quantity of the pre-petition goods.

36. Later, when DSS eventually produced at least some of the pre-petition goods it failed to deliver in January 2004, Wells Fargo's buyer was no longer interested in purchasing the goods.

37. The Contract requires DSS to keep "acceptable real-time record of receipts to forty-eight (4) hours..." [paragraph 2(a)(i)(2)]

38. The Contract requires DSS to "Pack and ship ordered products or Product samples using carriers hired by DSS and approved by Supplier within a maximum of seventy two (72) hours of order receipt..." [paragraph 2(a)(i)(4)]

Pg. 4

**BPI 0089**

39. The Contract provides that "DSS acknowledges that the Products delivered to DSS and all documents received and created by DSS while performing work under this Agreement…are the property of Supplier [Betta]…At the termination of this Agreement, DSS shall promptly return all of the property owned by Supplier [Betta] to Supplier [Betta]." [paragraph 9]

40. DSS breached the contract by failing to deliver requested goods to Wells Fargo in January 28, 2003.

41. Alternatively, there was a bailment relationship between Betta and DSS as to all of the goods in DSS's warehouse and DSS failed to return the bailed goods to Betta.

42. Alternatively, DSS's conduct constituted an act of wrongful conversion of Betta's property.

**Claim Number Two:**
**DSS failed to deliver all of the Post-petition goods to Betta**

43. On April 22, 2004, Betta removed all remaining goods from the DSS warehouse.

44. Betta had decided that it wanted to use the warehousing services of a different company, APL, and on April 22, 2004, Betta sent employees and a shipping agent to DSS to claim all of Betta's post-petition goods.

45. DSS shipped to the new warehousing company a quantity of goods that was less than the quantity of goods Betta had stored in the DSS warehouses post-petition.

46. The total value of the amount of the shortage was at least $401,275.12 and in a final amount to be determined after discovery and at the evidentiary hearing.

**BPI 0090**

47. DSS's failure to deliver these units to Betta when Betta pulled out of the warehouse caused Betta to be injured in the amount of at least $401,275.12 and in a final amount to be determined after discovery and at the evidentiary hearing.

48. The Contract requires DSS to keep "acceptable real-time record of receipts to forty-eight (4) hours..." [paragraph 2(a)(i)(2)]

49. The Contract requires DSS to "Pack and ship ordered products or Product samples using carriers hired by DSS and approved by Supplier within a maximum of seventy two (72) hours of order receipt..." [paragraph 2(a)(i)(4)]

50. The Contract provides that "DSS acknowledges that the Products delivered to DSS and all documents received and created by DSS while performing work under this Agreement...are the property of Supplier [Betta]...At the termination of this Agreement, DSS shall promptly return all of the property owned by Supplier [Betta] to Supplier [Betta]." [paragraph 9]

51. DSS breached the contract by failing to deliver the requested goods to Betta on April 22, 2004.

52. Alternatively, there was a bailment relationship between Betta and DSS as to all of the goods in DSS's warehouse and DSS failed to return the bailed goods to Betta.

53. Alternatively, DSS's conduct constituted an act of wrongful conversion of Betta's property.

**Claim Number Three:**
**DSS charged rent for storage and handling of goods that it did not deliver to Wells Fargo.**

54. On April 15, 2003, there were a certain amount of Betta's goods stored in DSS's warehouses. ("Pre-petition goods").

**BPI 0091**

55. The Pre-petition goods were a part of Betta's bankruptcy estate and were later abandoned to Wells Fargo.

56. DSS stored all of the pre-petition goods from April 15, 2003, until January 28, 2004, which was the day that DSS delivered <u>some</u> of the Pre-petition goods to Wells Fargo.

57. Either Betta or Wells Fargo paid the storage costs of all of the undelivered Pre-petition goods from April 15, 2003 through January 28, 2004.

58. For more than nine months, DSS stored the units of Pre-petition goods that it failed to deliver, and, for that entire nine months, DSS had charged Betta and/or Wells Fargo the costs of storing those products at the cost of $0.19 per cubic foot per month.

59. DSS should not have charged rent to Betta and/or Wells Fargo to store products that it did not deliver.

60. Betta and/or Wells Fargo paid excess rental charges in the amount of at least $113,131.00 ($12,570.00 per month for 9 months), and in a final amount to be proven after discovery and at the evidentiary hearing.

61. After January 28, 2004, DSS continued to charge Betta rent for the Pre-petition goods that it failed to deliver to Wells Fargo in January 2004.

62. At first, Betta was unaware that DSS was still charging rent for any of the pre-petition goods.

63. Then, on March 26, 2004, Betta downloaded an inventory list from DSS's servers and checked the inventory list against Betta's own records.

64. Betta discovered that DSS was over-charging rent in the amount of at least approximately $12,570.00, and in a final amount to be proven after discovery and at the evidentiary hearing.

**BPI 0092**

65. These over charges appeared on the invoices for the months of February, March, and April, a total of at least $37,710.00, and in a final amount to be proven after discovery and at the evidentiary hearing.

66. The total of over-charged rent that Betta and/or Wells Fargo paid during April 15, 2003, through April 22, 2004, for pre-petition goods that were never delivered was at least $150,841.00, and in a final amount to be proven after discovery and at the evidentiary hearing.

**Claim Number Four:**
**DSS charged Betta monthly rental costs to warehouse goods that DSS never delivered to Betta.**

67. Betta discontinued the contract with DSS on April 22, 2004.

68. Betta hired a shipping agent to pick up all of the post-petition goods from DSS's warehouse on April 22, 2004.

69. The goods that were delivered on that date were short of the expected and accounted for total number of units.

70. Even though Betta did not receive those goods from DSS on April 22, 2004, Betta had been paying rental charges to store those goods from April 16, 2003, through April 22, 2004.

71. The post-petition DSS caused Betta to pay rental charges from January 1, 2003, until April 22, 2004, on goods that were shipped to DSS's warehouse but were never delivered to Betta.

72. Not only was Betta deprived of the benefit of the goods themselves, Betta was made to pay rental charges even though the goods were never delivered.

**BPI 0093**

73. DSS should be made to return all of the rental payments Betta made during April 16, 2003, through April 22, 2004, for the storage of goods that DSS never delivered to Betta.

74. The total amount of the over-charged rent is not yet known, but will be proven through discovery and at the evidentiary hearing.

**Claim Number Five:**
**DSS charged and Betta paid carton handling fees for cartons that Betta and/or Wells Fargo never received.**

75. DSS charged a carton handling fee of $0.18 per carton for every carton that Betta shipped into the DSS warehouse.

76. All of DSS's allowed charges appear in section 4 of the Contract.

77. Section 4 of the Contract does not state that DSS is permitted to charge a carton handling fee.

78. The carton handling fee appears on all of the invoices from DSS to Betta.

79. DSS charged Betta a carton handling fee for all cartons that were shipped to DSS.

80. DSS even charged Betta carton handling fees for cartons of goods that were never delivered to Betta.

81. For all of the post-petition goods DSS did not deliver to Betta, DSS charged Betta carton handling fees, which Betta paid.

82. For all of the pre-petition goods DSS did not deliver to Wells Fargo, DSS charged Betta and/or Wells Fargo carton handling fees, which were paid by Betta and/or Wells Fargo.

83. The carton handling fees for the goods that were never produced were excessive and/or fraudulent.

**BPI 0094**

84. The total of the carton handling fees DSS improperly billed to Betta is not yet known but will be proven through discovery and at the evidentiary hearing.

**Claim Number Six:**
**DSS charged Betta a fee to conduct a yearly physical inventory of the property stored at DSS, even though this fee was not stated in the contract.**

85. In section 4 of the Contract, there is an express list of the fees that DSS is allowed to charge against Betta.

86. In section 4 of the Contract, there is no provision to allow DSS to charge a fee for an end of the year physical inventory.

87. Richard Shindle, a Betta employee, confirmed with Dave Smith, a DSS employee in a letter dated June 17, 1996, that DSS did not charge for one physical inventory per year.

88. DSS charged Betta $16,541.25 to conduct a physical inventory at year-end 2002.

89. DSS charged Betta $20,089.75 to conduct a physical inventory at year-end 2001.

90. DSS charged Betta $16,716.00 to conduct a physical inventory at year-end 2000.

91. DSS charged Betta $8,001.00 to conduct a physical inventory at year-end 1999.

92. Each of these charges was excessive and not permitted under the contract.

93. Betta paid these charges only because DSS held a lien on Betta's goods under the contract and DSS would have exercised that lien if Betta did not pay the fees.

94. The total of the fees for year-end physical inventories that DSS charged to Betta, impermissibly under the contract, was at least $61,348.00, and in a final amount to be proven after discovery and at the evidentiary hearing.

**BPI 0095**

## PRAYER FOR RELIEF

1. DSS should pay Betta for the value of the pre-petition goods that Betta delivered to DSS's warehouse and which DSS did not deliver to Wells Fargo or Wells Fargo's agent on January 28, 2004, in the amount of at least $530,005.05 and in a final amount to be proven at the evidentiary hearing,

2. DSS should pay Betta for the value of the post-petition goods that Betta delivered to DSS's warehouse and which DSS did not deliver to Betta on April 22, 2004, in the amount of at least $401,275.12 and in a final amount to be proven at the evidentiary hearing.

3. DSS should pay Betta for the value of the over-charges of monthly rent for each of the units of pre-petition goods that were not delivered to Wells Fargo, which over-charges occurred on invoices from April 15, 2003, through April 22, 2004, in the amount of at least $150,841.00 and in a final amount to be proven at the evidentiary hearing,

4. DSS should pay Betta for the value of the over-charges of monthly rent for each of the units of post-petition goods that were not delivered to Betta, which over-charges occurred on invoices from April 15, 2003, through April 22, 2004, in an amount to be proven through discovery and at the evidentiary hearing,

5. DSS should pay Betta the carton handling fees that it charged to process the pre-petition and post-petition goods that Betta delivered to DSS, but that DSS did not deliver to Betta and/or Wells Fargo, which fees were not allowed in the contract, and in an amount to be proven through discovery and at the evidentiary hearing,

BPI 0096

6. DSS should pay Betta the excessive and unauthorized fees for a year-end inventory for the years 1999 through 2002, in the amount of at least $61,348.00 and in a final amount to be proven through discovery and at the evidentiary hearing.

*** END ***

BPI 0097

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

The undersigned certifies and declares as follows:

I am employed in the City of Westlake Village and County of Los Angeles, in the State of California. I am over the age of 18 and not a party to the within action. I am employed by Brinkman Portillo, P.C. whose business address is 4333 Park Terrace Drive, Suite 205, Westlake Village, California 91361.

On **October 9, 2006**, I served the forgoing documents described as:

**DECLARATION OF CHRISTINA ERICKSON IN SUPPORT OF PLAINTIFF'S MOTION FOR: 1) MODIFICATION OF THE STAY PENDING ARBITRATION; 2) LEAVE TO AMEND THE COMPLAINT**

on the interested parties in this action
[X] by placing [] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

**[X] BY OVERNITE EXPRESS**
Mitchell Greenberg
Abbey, Weitzenberg, Warren & Emery
100 Stony Point Rd., #200
P.O. Box 1566
Santa Rosa, CA 95401

**[X] BY EMAIL**
James A. Beitz
Hagerty Johnson & Beitz PA
701 Fourth Avenue South, Suite 700
Minneapolis, MN 55415
tbeitz@hjab.com

**[X] BY MAIL**
United States Trustee's Office
235 Pine Street, Ste 700
San Francisco, CA 94104

[X] I deposited such envelope in a United States Postal Service drop box at Westlake Village, California. The envelope was mailed with postage thereon fully prepaid.
[X] I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with a United States Postal Service drop box on that same day with postage thereon fully prepaid at Westlake Village, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit of mailing in affidavit.
[X] **(Federal)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
Executed on **October 9, 2006**, at Westlake Village, California.

Luis Carmona

_____

**BPI 0098**