# EXHIBIT "4"

BPI 0099

Daren R. Brinkman (State Bar No. 158698)
Laura J. Portillo (State Bar. No. 186813)
BRINKMAN PORTILLO, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Telephone: (818) 597-2992
Facsimile: (818) 597-2998

Special Counsel to Betta Products Inc.,
And special counsel to Dana McCurnin,
Trustee of the Betta Products Litigation
Trust

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>BETTA PRODUCTS, INC., a California Corporation<br><br>Debtor.<br><br>BETTA PRODUCTS, INC., the Debtor in Possession,<br><br>Plaintiff,<br><br>v.<br><br>DISTRIBUTION SYSTEMS AND SERVICES, INC., aka DSS,<br><br>Defendant. | Bankruptcy Case No. 03-10925 AJ<br><br>Chapter 11<br><br>Adversary No. 05-01046<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE AFFIRMATIVE DEFENSES**<br><br>Date:   August 3, 2007<br>Time:   10:00 a.m.<br>Place:   99 South E Street<br>        Santa Rosa, CA |

1

**BPI 0100**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................2

II.   STATEMENT OF UNDISPUTED FACTS ...........................................................2

III.  ARGUMENT .......................................................................................................12

    A.   Summary Judgment Should Be Granted Dismissing Many of DSS's Affirmative Defenses Because the Undisputed Facts Show that These Defenses Are Unsupported. ....................................................................................................12

        1.   DSS's First Affirmative Defense Fails Because Plaintiffs Have Alleged Facts Sufficient to Support Each of Plaintiff's Claims. ...............................12

        2.   DSS's Second Affirmative Defense Fails Because Plaintiffs Have Not Waived Their Claims Against DSS. ...................................................................13

        3.   DSS's Third Affirmative Defense Fails Because Plaintiffs Are Not Estopped From Asserting the Claims in the Amended Complaint. .....................14

        4.   DSS's Fourth Affirmative Defense Fails Because the Doctrine of Laches is not Applicable in this Situation. .......................................................15

            a.   Plaintiffs did not delay the start of the present adversary action. ..................16

            b.   Plaintiffs did not approve of, or agree to DSS's failure to produce all of the Pre-Petition and Post-Petition Goods. .................................16

        5.   DSS's Sixth Affirmative Defense Fails Because Wells Fargo Performed All of its Obligations Under the Oral Contract ...........................................16

        6.   DSS's Ninth Affirmative Defense Fails Because Plaintiffs have Standing to Assert All of the Claims Against DSS..........................................17

        7.   DSS's Tenth Affirmative Defense Fails Because The Claims Against DSS Belonged to Betta, Not the Bankruptcy Estate, And It Is Not Necessary For The Trust to Have Representative of the Estate Status. ...............18

        8.   DSS's Eleventh Affirmative Defense Fails Because the Amended Complaint Does Not Assert Claims that Were Subject to Arbitration. .................20

        9.   DSS's Twelfth Affirmative Defense Fails Because Collateral Estoppel Does Not Apply to the Arbitration Award. ............................................21

            a.   The Arbitration Award is not entitled to any collateral estoppel effect............21

                (i)   The Arbitration Award is not a judgment based upon the merits of the issues it decided. ............................................................22

i

**BPI 0101**

(ii)    Plaintiffs were not given a full and fair opportunity to be heard in the arbitration and the award is nothing more than a judgment in default.23

b.    If the Court finds that the Arbitration Award does have collateral estoppel effects, those effects are limited to specific breach of contract claims............23

10.    DSS's Thirteenth Affirmative Defense Fails Because Betta and Wells Fargo Did Not Abandon the Goods. .................................................................................25

11.    DSS's Fifteenth Affirmative Defense Fails Because The Claims Against DSS Were Preserved in the Confirmed Plan...........................................................25

12.    DSS's Eighteenth Affirmative Defense Fails Because The Settlement Between Wells Fargo and DSS Could Not Settle Claims Previously Assigned to Betta. ...................26

IV.    CONCLUSION...........................................................................................26

TABLE OF CONTENTS/TABLE OF AUTHORITIES    **BPI 0102**

1

## TABLE OF AUTHORITIES

2

**8**

3

*Baldwin v. Kilpatrick*, 249 F.3d 912 (9th Cir. 2001)................................................22

4

*Bugna v. McArthur*, 33 F.3d 1054 (9th Cir. 1994)..................................................22

5

*In re Churchfield Management & Investment Corp.*, 122 B.R 76 (N.D. Ill. Bankr. 1990)........19

6

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (N.J. Bankr. 1990) ........................................19

7

*In re Sweetwater*, 884 F.2d 1323 (10th Cir. 1989)..................................................19

8

9

### State Cases

10

*Asia Inv. Co., Ltd. v. Borowski*, 184 Cal. Rptr. 317 (Cal. App. 3rd Dist. 1982) ...............15

11

*Bias v. Ohio Farmers Indemnity Co.*, 28 Cal. App.2d 14 (Cal. Ct. App. 1938)..................20

12

*Douglas Aircraft Co. v. Byram*, 57 Cal. App. 3d 311 (Cal. Ct. App. 1943) ....................20

13

*Ill. Farmers Ins. Co. v. Reed*, 662 N.W.2d 529 (Minn. 2003) ..................................22

14

*In re Application of Hofstad to Register Title to Certain Land*, 376 N.W.2d 698 (Minn. App.

15

    1985)..............................................................................................23

16

*In re Marriage of Moore*, 113 Cal. App. 3d 22 (Cal. Ct. App. 1980) ............................13

17

*In re Marriage of Recknor*, 138 Cal. App. 3d 539 (Cal. Ct. App. 1982) ........................14

18

*In re Marriage of Stephenson*, 162 Cal. App. 3d 1057 (Cal Ct. App. 1984) ....................13

19

*Lyon Financial Services, Inc. v. Waddill*, 625 N.W. 2d 155 (Minn. App. 2001)................23

20

*Marshall v. Marshall*, 42 Cal.Rptr. 686 (Cal App. 1st Dist. 1965)...............................15

21

22

*Ponce v. Graceous Nav., Inc.*, 179 Cal. Rptr. 164 (Cal. App. 2nd Dist. 1981)..................15

23

*Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142 (2001)................................14

24

### Federal Statutes

25

11 U.S.C. §1123(b) ..................................................................................18, 19

26

11 U.S.C. §1141(b) ..................................................................................20

27

### State Statutes

28

Cal. Civil Code §3527................................................................................15

iii

1    Betta Products, Inc. ("Betta") and Dana McCurnin ("Trustee"), Trustee of the Betta Products

2  Litigation Trust (collectively, "Plaintiffs") now file this memorandum in support of Plaintiffs'

3  Motion for Partial Summary Judgment re Affirmative Defenses, filed concurrently herewith.

4    **I.    INTRODUCTION**

5  Plaintiffs seek judgment from the Court, based upon Rule 56(b), dismissing DSS's first, second,

6  third, fourth, sixth, ninth, tenth, eleventh, twelfth, thirteenth, fifteenth, and eighteenth affirmative

7  defenses. The Court should grant summary judgment dismissing DSS's first, second, third,

8  fourth, sixth, ninth, tenth, eleventh, twelfth, thirteenth, fifteenth, and eighteenth affirmative

9  defenses for the following reasons:

10        1.   There are no facts which can support DSS's first, second, third, fourth, sixth,

11             ninth, tenth, eleventh, twelfth, thirteenth, fifteenth, and eighteenth affirmative

12             defenses, and

13        2.   Plaintiffs are entitled to summary judgment dismissing these unsupported

14             defenses.

15    **II.    STATEMENT OF UNDISPUTED FACTS**

16  1.  At all times relevant to the complaint, Betta Products, Inc., ("Betta") was a California

17      corporation.

18  *See* Declaration of Dana McCurnin in Support of Plaintiffs' Motion for Partial Summary

19  Judgment ("McCurnin Declaration"), ¶8.

20  2.  At all times relevant to the complaint, Betta was a company that sold paper and party

21      products to retail stores in the United States.

22  *See* McCurnin Decl, ¶8.

23  3.  Betta did not make the paper and party products it sold; Betta hired manufacturing companies

24      to make the products that it sold.

25  *See* McCurnin Decl., ¶9.

26
27  4.  At all times relevant to the complaint, Distribution Systems and Services, Inc., ("DSS") was

28      a company that performed warehousing services for profit.

2

5.  DSS owned and maintained a warehouse in Ontario, California.

*See* McCurnin Decl., ¶11.

6.  DSS also owned and maintained a warehouse in Minnesota as well.

*See* McCurnin Decl., ¶12.

7.  On May 1, 1996 Betta and DSS entered into a written agreement ("Contract").

*See* McCurnin Decl., ¶10 and Exhibit A.

8.  In the Contract, DSS agreed to store all of Betta's products that Betta delivered to DSS in exchange for a monthly storage fee.

*See* McCurnin Decl., ¶10 and Exhibit A.

9.  Also in the Contract, DSS agreed to act as a distributor for Betta – to pack and ship Betta's products to Betta's customers, according to information and requests Betta would send to DSS.

*See* McCurnin Decl., ¶10 and Exhibit A.

10. DSS stored Betta's products in both the Ontario warehouse and the Minnesota warehouse.

*See* McCurnin Decl., ¶12.

11. On December 31, 2002, DSS conducted a year-end physical inventory of all of Betta's products that were stored in its warehouses.

*See* McCurnin Decl., ¶16.

12. For the year-end physical inventory, DSS employees physically located, counted and measured all of the boxes that Betta was storing, at that time, at DSS's warehouses.

*See* McCurnin Decl., ¶17.

13. It took several days to complete the physical inventory.

*See* McCurnin Decl., ¶18.

14. Betta sent some of its employees to the DSS warehouse in Ontario to observe the year-end physical inventory that DSS conducted.

*See* McCurnin Decl., ¶19.

3

15. Betta employees spot checked the inventory count by requesting to inspect certain boxes. Betta employees opened the boxes and counted the products inside the boxes to make sure that the count was accurate.

*See* McCurnin Decl., ¶19-20.

16. In discovery, DSS produced a set of records to Plaintiffs that showed the results of the year-end physical inventory for December 31, 2002 (hereafter, "DSS Inventory Report").

*See* Declaration of Daren R. Brinkman in Support of Plaintiffs' Motion for Summary Judgment ("Brinkman Decl."), ¶ 5-8.

17. Plaintiffs accept as true and accurate that portion of the DSS Inventory Report showing the total count of each of Betta's products after the year-end physical inventory on December 31, 2002.

*See* McCurnin Decl., ¶24; *see also* Brinkman Decl., ¶10.

18. Betta continued to ship goods to and from the warehouse after the physical inventory for December 31, 2002 was complete.

*See* McCurnin Decl., ¶26.

19. Each time Betta shipped a quantity of product to a DSS warehouse, DSS sent a transaction report to Betta describing how many units of each product had been received.

*See* McCurnin Decl., ¶27.

20. Through the Contract, DSS had an obligation to store and keep safe each unit of product that Betta shipped to DSS.

*See* McCurnin Decl., Exhibit A, page 5, section 5(a).

21. Each time Betta shipped units to DSS a bailment was created.

22. The DSS Inventory Report shows details of when DSS received shipments of Betta's products, and how many of each product was received in each shipment for the time period December 31, 2002 through August 1, 2004.

*See* Brinkman Decl., ¶11.

4

23. On April 15, 2003, Betta filed for Chapter 11 bankruptcy relief in the Bankruptcy Court of the Northern District of California.

*See* Request for Judicial Notice in Support of Plaintiffs' Motion for Summary Judgment, ("Request for Judicial Notice"), Exhibit 4, pg. 3, lines 3-4.

24. Everything that was stored in a DSS warehouse on April 15, 2003 was deemed to be property of the bankruptcy estate of Betta ("Pre-Petition Goods").

*See* McCurnin Decl., ¶34.

25. Every new shipment that DSS received after April 15, 2003 was property of the reorganized Betta ("Post-Petition Goods").

26. Betta stored both Pre-Petition Goods and Post-Petition Goods in the DSS warehouses.

*See* McCurnin Decl., ¶43 – 44.

27. Betta requested that DSS keep the goods separate from each other but DSS failed to comply with this request.

*See* McCurnin Decl., ¶44.

28. On July 11, 2003, by order of the Bankruptcy Court, Betta abandoned all of the Pre-Petition Goods to Wells Fargo Bank, N.A. ("Wells Fargo"), a creditor in the bankruptcy.

*See* Request for Judicial Notice, Exhibit 1.

29. After Betta abandoned the Pre-Petition Goods to Wells Fargo, the Pre-Petition Goods remained in the DSS warehouses.

*See* McCurnin Decl., ¶47.

30. DSS charged Wells Fargo monthly rental payments to store all of the Pre-Petition Goods at the same rates established in the Contract between DSS and Betta.

*See* McCurnin Decl., ¶48-50.

31. Wells Fargo paid each of the monthly rental payments to DSS.

*See* McCurnin Decl., ¶49-50.

32. Wells Fargo spent several months trying to find a buyer for the Post-Petition Goods.

Memorandum in Support of Plaintiffs' Motion for Summary Judgment re Affirmative Defenses
Ad. Case No. 05-01046

**BPI 0107**

1  *See* McCurnin Decl., ¶51.

2  33. In or about December 2003 or January 2004, Wells Fargo asked DSS to prepare to ship all of

3      the Pre-Petition Goods.

4  *See* McCurnin Decl., ¶54.

5  34. In or about January 2004, DSS did ship out to Wells Fargo (or Wells Fargo's agent) a

6      quantity of Pre-Petition Goods.

7  *See* McCurnin Decl., ¶55.

8  **Betta's Business Relationship With DSS After the Bankruptcy**

9
10 35. After Betta filed for bankruptcy protection, Betta continued to pay DSS for the warehousing

       and distributing services DSS performed for Betta.
11
12 *See* McCurnin Decl., ¶36-39.

13 36. After the bankruptcy Petition Date, DSS required Betta to pre-pay for its services.

14 *See* McCurnin Decl., ¶38.

15 37. After the bankruptcy Petition Date, Betta made the following payments to DSS by check:

16

| Date of Check | Check Number | Amount of Check |
|---|---|---|
| 4/25/2003 | 1001 | -$42,000.00 |
| 5/14/2003 | 1106 | -$21,000.00 |
| 5/22/2003 | 1123 | -$21,000.00 |
| 5/29/2003 | 1145 | -$21,000.00 |
| 6/5/2003 | 1162 | -$21,000.00 |
| 6/11/2003 | 1221 | -$21,000.00 |
| 6/20/2003 | 1241 | -$21,000.00 |
| 7/3/2003 | 1285 | -$21,000.00 |
| 7/11/2003 | 1303 | -$21,000.00 |
| 7/22/2003 | 1364 | -$10,000.00 |
| 7/28/2003 | 1393 | -$10,000.00 |
| 8/4/2003 | 1402 | -$10,000.00 |
| 8/26/2003 | 1513 | -$10,000.00 |
| 8/29/2003 | 1533 | -$10,000.00 |
| 9/10/2003 | 1552 | -$10,000.00 |
| 9/10/2003 | 1552 | -$10,000.00 |
| 9/19/2003 | 1613 | -$6,000.00 |
| 9/26/2003 | 1637 | -$6,000.00 |
| 10/3/2003 | 1658 | -$6,000.00 |
| 10/10/2003 | 1673 | -$6,000.00 |
| 10/17/2003 | 1704 | -$6,000.00 |

17

18

19

20

21

22

23

24

25

26

27

28

6

**BPI 0108**

| | | |
|---|---|---|
| 10/21/2003 | 1723 | -$6,000.00 |
| 10/31/2003 | 1749 | -$6,000.00 |
| 11/7/2003 | 1771 | -$6,000.00 |
| 11/14/2003 | 111402 | -$507.61 |
| 11/21/2003 | 1818 | -$6,000.00 |
| 12/23/2003 | 1933 | -$6,000.00 |
| 12/30/2003 | 1967 | -$6,000.00 |
| 12/31/2003 | | -$3,859.47 |
| 1/9/2004 | 1988 | -$6,000.00 |
| 1/23/2004 | 2015 | -$12,000.00 |
| 3/26/2004 | 2197 | -$6,000.00 |

*See* McCurnin Decl., ¶39

38. After the Petition Date, Betta paid a total of $374,367.08 to DSS to compensate DSS for the services that DSS provided to Betta.

*See* McCurnin Decl., ¶40.

39. DSS was an unsecured creditor in the bankruptcy proceedings.

*See* Request for Judicial Notice, Exhibit 2.

40. Betta continued its business relationship with DSS after the Petition Date and until approximately June or July of 2004.

*See* McCurnin Decl., ¶7.

41. In or about March 2004, Betta began to look for an alternative company to handle the warehousing and distribution of Betta's products.

*See* McCurnin Decl., ¶58.

42. In about April 2004, Betta hired APL Logistics WMS, Inc. ("APL"), to take over the warehousing and distribution of Betta's products.

*See* McCurnin Decl., ¶59.

43. Betta requested that DSS ship all of the Betta products that were located in any of the DSS warehouses to the APL warehouse in Oakland, California.

*See* McCurnin Decl., ¶60.

44. On April 29, 2004, APL received the first transfer of Betta's goods from DSS.

*See* Brinkman Decl., ¶15 and Exhibit A.

7

BPI 0109

45. By the end of May 2004, APL stopped receiving transfer shipments of Betta's products from DSS.

*See* Brinkman Decl., ¶16 and Exhibit A.

46. The DSS Inventory Report shows that, after DSS made the transfers to APL, there remained a total of 966,367 items of Betta's products in the DSS warehouses.

*See* Brinkman Decl., ¶18.

47. DSS failed to turn over the total amount of Betta's products that were stored in its warehouse.

*See* McCurnin Decl., ¶64.

48. The DSS Inventory Report makes no distinction between Post-Petition Goods and the Pre-Petition Goods.

*See* Brinkman Decl., ¶19.

49. The at least 966,367 items of Betta's products remaining in the DSS warehouses are a mix of Post-Petition Goods and Pre-Petition Goods.

*See* Brinkman Decl., ¶20.

50. The Contract provides that "DSS acknowledges that the Products delivered to DSS and all documents received and created by DSS while performing work under this Agreement…are the property of Supplier [Betta]…At the termination of this Agreement, DSS shall promptly return all of the property owned by Supplier [Betta] to Supplier [Betta]."

*See* McCurnin Decl., Exhibit A, page 7, section 9.

**Fraud**

51.  DSS was obligated, as a term of the Contract, to keep accurate records showing all of the Betta products that were shipped into DSS warehouses.

*See* McCurnin Decl., Exhibit A, pg.2, section 2(a)(i)(2).

52. DSS was also obligated to keep records of all Betta goods that were returned to DSS by Betta's customers and to provide monthly reports of the returned goods.

8

**BPI 0110**

1   *See* McCurnin Decl., Exhibit A, pg. 2, section 2(a)(i)(6).

2   53. DSS sent reports to Betta showing the quantity of products shipped in to DSS and reports

3       showing the quantity of products shipped out to Betta's customers.

4   *See* Brinkman Decl. ¶ 11; *see also* McCurnin Decl., ¶ 25-30.

5   54. DSS sent reports to Betta showing the running total of each product that existed in the DSS

6       warehouses.

7   *See* Brinkman Decl., ¶8.

8   55. The DSS Inventory Report is wrong.

9   *See* McCurnin Decl., ¶66 – 67.

10  **The Bankruptcy Proceedings**

11  56. Betta's First Amended Chapter 11 Plan (the "Plan") was confirmed on May 17, 2004.

12  *See* Request for Judicial Notice, Exhibit 3.

13  57. Wells Fargo was one of the largest creditors in the Betta bankruptcy.

14  *See* McCurnin Decl., ¶46.

15  58. Prior to Plan confirmation, Betta and Wells Fargo came to a settlement regarding the debts

16      Betta owed to Wells Fargo, which was evidenced by a written Settlement Agreement dated

17      March 2004.

18  *See* McCurnin Decl., ¶70.

19  59. The written Settlement Agreement is referred to in the Plan and incorporated thereto by

20      reference.  The written Settlement Agreement is also physically attached to the Plan as

21      Exhibit A.

22  *See* Request for Judicial Notice, Exhibit 4; *see also* McCurnin Decl., ¶71.

23  60. In the written Settlement Agreement, Wells Fargo assigned to Betta "all of Wells Fargo's

24      rights and claims, if any, against Distribution Systems & Services ("DSS") for loss of

25      prepetition inventory…"

26  *See* Req. for Judicial Notice, Exhibit 4, pg. 3, Section 7.

27

28

9

**Facts Related to the Arbitration Proceeding**

61. Shortly after the Original Complaint was filed, the bankruptcy court ordered the parties to arbitration.

*See* document # 8, filed on July 11, 2005, filed in this adversary proceeding.

62. Plaintiffs filed an arbitration demand on November 2, 2005.

*See* Brinkman Decl., ¶21.

63. In the arbitration, at the request of the panel of three arbitrators, Plaintiffs filed a Specification of Claims, which was a document describing each of the claims asserted against DSS.

*See* Brinkman Decl., ¶23 and Exhibit B.

64. The Specification of Claims asserted the following claims: breach of contract, bailment, and conversion.

*See* Brinkman Decl., Exhibit B.

65. As the arbitration proceeding progressed, the arbitrators set the date for the evidentiary hearing for November 13, 2006 through November 17, 2006, in Minneapolis, Minnesota.

*See* Brinkman Decl., ¶24.

66. In September of 2006, DSS filed a "Motion to Dismiss all or Part of Betta's Claims" (hereafter, "Motion to Dimiss")

*See* Brinkman Decl., ¶25-26 and Exhibit C.

67. The panel of arbitrators did not rule upon DSS's Motion to Dismiss.

*See* Brinkman Decl., Exhibit D.

68. In the Motion to Dismiss, DSS argued that the Plaintiffs' claims for conversion and breach of bailment were beyond the scope of the arbitration agreement in the Contract.

*See* Brinkman Decl., ¶26 and Exhibit C.

Memorandum in Support of Plaintiffs' Motion for Summary Judgment re Affirmative Defenses
Ad. Case No. 05-01046

**BPI 0112**

1    69. Soon after DSS filed its Motion to Dismiss, Plaintiff filed a "Motion to Amend 1)

2       Modification of the Stay Pending Arbitration; 2) Leave to Amend the Complaint" (hereafter,

3       "Motion to Amend").

4    *See* document # 24, filed on October 9, 2006, filed in this adversary proceeding.

5    70. The purpose of the Motion to Amend was to obtain permission to amend the Complaint to

6       clearly identify what the claims that were excluded from the arbitration proceeding.

7    *See* Brinkman Decl., ¶29.

8    71. Plaintiffs' Motion to Amend was granted on October 20, 2006.

9    *See* document # 30, filed on October 20, 2006, filed in this adversary proceeding.

10

11    72. On October 23, 2006, Plaintiffs withdrew their arbitration demand from the American

12       Arbitration Association.

13    *See* Brinkman Decl., ¶32.

14    73. The arbitration panel held the evidentiary hearing on November 13, 2006 beginning at 9am.

15    *See* Brinkman Decl., ¶33.

16    74. No one appeared at that hearing on behalf of Plaintiffs.

17    *See* Brinkman Decl., ¶34.

18    75. At the evidentiary hearing, DSS presented evidence to the arbitrators.

19    *See* Brinkman Decl., Exhibit D.

20    76. On November 16, 2007, the arbitrators issued an Arbitration Award.

21    *See* Brinkman Decl., ¶35 and Exhibit D.

22    77. The Arbitration Award ruled that Plaintiffs' withdrawal of their arbitration demand was a

23       motion to dismiss and that the motion to dismiss was denied.

24    *See* Brinkman Decl., Exhibit D.

25    78. The Arbitration Award also ruled that "there is no credible evidence in the arbitration record

26       sufficient to establish any of the breaches of contract alleged in Claimants' Specification of

27       Claims".

28

**BPI 0113**

1 | *See* Brinkman Decl., Exhibit D.

2 | III.    **ARGUMENT**

3 | A. **Summary Judgment Should Be Granted Dismissing Many of DSS's Affirmative Defenses**

4 | **Because the Undisputed Facts Show that These Defenses Are Unsupported.**

5 | Plaintiffs seek summary judgment as to DSS's first, second, third, fourth, sixth, ninth,

6 | tenth, eleventh, twelfth, thirteenth, fifteenth, and eighteenth affirmative defenses.

7 | 1.    **DSS's First Affirmative Defense Fails Because Plaintiffs Have Alleged Facts**

8 | **Sufficient to Support Each of Plaintiff's Claims.**

9 | Plaintiffs have alleged in the Amended Complaint, and presented in this motion for

10 | summary judgment, facts and evidence supporting each element of Plaintiffs' Asserted Claims.

11 | Regarding Plaintiffs' claim for breach of contract, Plaintiffs have alleged facts, and

12 | presented undisputed facts as argued *supra*, showing that there was a valid oral contract between

13 | Wells Fargo and DSS, that Wells Fargo performed its obligations under the oral contract, and

14 | that DSS failed to perform its obligations under the oral contract. The only issue remaining is

15 | the question of damages: exactly how many Pre-Petition Goods were not returned to Wells Fargo

16 | and the value of those Pre-Petition Goods. There are at least three sets of records detailing how

17 | many of the Pre-Petition Goods were not returned to Wells Fargo and many more sets of records

18 | that give specific values to each of the Pre-Petition Goods, which is why a resolution of the issue

19 | of damages is not sought through summary judgment. Regardless, Plaintiffs have properly

20 | alleged and substantially proven its claim for breach of contract.

21 | Plaintiffs have also alleged sufficient facts and presented undisputed facts supporting the

22 | claims for conversion, breach of bailment, fraud, negligent misrepresentation, and negligence, as

23 | alleged in the Amended Complaint. The debate of the exact value of the damages resulting from

24 | each of these claims is an issue reserved for trial, but the existence of damages has been alleged.

25 | Plaintiff's seventh's claim, a claim for Turnover of Property of the Bankruptcy Estate

26 | under 11 U.S.C. §542, is not a part of this motion for summary judgment, however; Plaintiffs

27 | have alleged sufficient facts to support the seventh claim in the Amended Complaint.

28 |

12

**BPI 0114**

1   Based upon the Amended Complaint and the facts and arguments presented in this

2   motion for summary judgment, Plaintiffs have sufficiently stated the facts in support of their

3   claims and DSS's First Affirmative Defense should be denied in its entirety.

4       **2.        DSS's Second Affirmative Defense Fails Because Plaintiffs Have Not Waived**

5               **Their Claims Against DSS.**

6   This affirmative defense is asserted against all of Plaintiffs' claims.  A party waives his or

7   her rights or claims against a defendant if the party voluntarily relinquishes the right or the claim

8   with "sufficient awareness of the relevant circumstances and likely consequences" to show

9   intentional relinquishment of the right.  *In re Marriage of Moore*, 113 Cal. App. 3d 22, 27 (Cal.

10  Ct. App. 1980); *see also In re Marriage of Stephenson*, 162 Cal. App. 3d 1057, 1072 (Cal Ct.

11  App. 1984) (superseded by statute on a different issue).  Also, the burden of "proof is on the

12  party claiming a waiver to prove it by evidence that does not leave the matter doubtful or

13  uncertain," that the other party has knowingly waived its right.  *In re Marriage of Moore*, 113

14  Cal. App. 3d at 27.

15

16  DSS cannot to meet its burden and prove the affirmative defense of waiver, because there

17  are no facts supporting the argument that Plaintiffs voluntarily relinquished their rights to bring

18  this suit against DSS.  The undisputed facts show that Plaintiffs undertook efforts to preserve the

19  right to sue DSS, and did not give up any of the claims asserted in the Amended Complaint.

20  Betta preserved its right to bring claims against DSS in the Confirmed Chapter 11 Plan.

21  In section 7.04(c) of the Confirmed Plan, Betta expressly reserved the right to bring claims

22  against DSS as follows:

23          7.04.  Debtor shall reserve the rights to pursue the following…
            c.  Claims and rights of set off against Distribution Systems & Services Corporation
24          arising from the warehousing agreement dated May 1, 1996, payments, overcharges, lost
            and damaged goods, and claims assigned pursuant to the Compromise Agreement…
25

26  In the above quoted section of the Plan, Betta expressly reserved the right to bring claims

27  against DSS not just based upon the Contract, but also for "lost and damaged goods" and claims

28  "assigned pursuant to the Compromise Agreement [the term "Compromise Agreement" is

13

**BPI 0115**

1    defined in the Plan and refers to the Settlement Agreement between Wells Fargo and Betta,

2    attached as Exhibit A to the Plan]".  Therefore, Betta reserved its right to bring the tort claims

3    asserted in the Amended Complaint, seeking damages for the lost and damaged goods as well as

4    the claim for breach of an oral contract, which Plaintiffs assert on behalf of Wells Fargo.

5        There are also no facts showing that the Trustee of the Betta Products Litigation Trust

6    (the "Trust") ever waived the Trust's claims.  The Trust was formed only shortly before the

7    adversary action against DSS was filed and the Trust's few official acts have not included a

8    voluntary waiver of claims against DSS.  The undisputed facts show that neither Betta nor the

9    Trust waived its claims against DSS, and the second affirmative defense should be dismissed

10   entirely.

11

12       **3.    DSS's Third Affirmative Defense Fails Because Plaintiffs Are Not Estopped
              From Asserting the Claims in the Amended Complaint.**

13       The defense of estoppel is an equitable defense and "applies to prevent a person from

14   asserting a right where his conduct or silence makes it unconscionable for him to assert it." *In re*

15   *Marriage of Recknor*, 138 Cal. App. 3d 539, 546 (Cal. Ct. App. 1982).  Equitable estoppel will

16   stop a party from asserting contradictory positions if "the [other] party has been induced to

17   refrain from using such means or taking such action as lay in his power, by which he might have

18   retrieved his position and saved himself from loss." *Vu v. Prudential Prop. & Cas. Ins. Co.*, 26

19   Cal. 4th l 142, 1152 (2001).  This affirmative defense does not apply in the present case because

20   it is not contradictory for Plaintiffs to assert claims in the bankruptcy court that could not have

21   been resolved in the arbitration proceeding.

22       Plaintiffs agreed to submit to arbitration and filed a claim with the American Arbitration

23   Association in November 2005.  Plaintiffs' statement of the claims asserted in the arbitration

24   included claims for conversion and bailment as well as claims for breach of contract.  As the

25   arbitration case proceeded, it was DSS who <u>first</u> raised the issue that certain of the claims

26   asserted in the arbitration were not arbitrable claims and had to be dismissed.  DSS raised this

27

28

14

---

BPI 0116

issue in a Motion to Dismiss that it filed in September 2006, seeking to dismiss all claims asserted in the arbitration other than the breach of contract claim.

In response to DSS's Motion to Dismiss, Plaintiffs filed the Motion for Leave to Amend in the bankruptcy court, seeking clarification that the non-contract claims would be heard in some court, if not in the arbitration proceedings. Plaintiffs won their motion to amend and the Amended Complaint was filed, entirely excluding the arbitrable issue of whether the Contract between Betta and DSS had been breached. Plaintiffs' decision to seek formal orders from the Bankruptcy Court allowing the non-contract claims to be heard was not an inconsistent position, but was consistent with DSS's argument that the non-contract claims should not be arbitrated.

Plaintiffs have not asserted any contradictory positions, and, in a way, Plaintiffs have agreed with DSS regarding what can and cannot be arbitrated, while seeking to clearly remove the non-contract claims from the arbitration and place them back in the Bankruptcy Court.

DSS's third affirmative defense, estoppel, should be denied.

### 4.     DSS's Fourth Affirmative Defense Fails Because the Doctrine of Laches is not Applicable in this Situation.

California courts are required to help "the vigilant, before [helping] those who sleep on their rights." Cal. Civil Code §3527. DSS alleges that Plaintiffs have not been diligent in asserting their claims, and that the entirety of the Amended Complaint should be dismissed under the doctrine of laches. To be successful, DSS must show "unreasonable delay in bringing [the] action by plaintiffs as well as either acquiescence in defendant's conduct or prejudice." *Asia Inv. Co., Ltd. v. Borowski*, 184 Cal. Rptr. 317, 322 (Cal. App. 3rd Dist. 1982); *see also Ponce v. Graceous Nav., Inc.*, 179 Cal. Rptr. 164, 168 (Cal. App. 2nd Dist. 1981) (in order to prevail on defense of laches, a party must establish existence of inexcusable delay in bringing an action and resultant prejudice to the defense); *see also Marshall v. Marshall*, 42 Cal.Rptr. 686, 699 (Cal App. 1st Dist. 1965) ("Laches" is unreasonable delay in asserting a right which causes prejudice to an adverse party and renders granting of relief inequitable). In the present case, the defense of

15

laches does not apply because there is neither unreasonable delay in bringing this litigation, nor was there acquiescence in DSS's failure to produce the Pre-Petition and Post-Petition Goods.

### a. Plaintiffs did not delay the start of the present adversary action.

This adversary action was filed on April 14, 2005, approximately a year after DSS failed to return to Betta and Wells Fargo the goods that were stored in DSS's warehouses. All of Plaintiffs' tort claims have a statute of limitations that is at least three years long pursuant to California Civil Code §338, and this action was brought only a year after the acts giving rise to the claims occurred. Plaintiffs also brought this adversary action against DSS before the two year statute of limitations set by the bankruptcy code expired, making the claim for turnover under the bankruptcy code a timely filed claim as well.

Plaintiffs did not delay bringing this adversary action, as is evidenced by the fact that Plaintiffs filed the original complaint only one year after the claims arose.

### b. Plaintiffs did not approve of, or agree to DSS's failure to produce all of the Pre-Petition and Post-Petition Goods.

There is absolutely no evidence even suggesting that Plaintiffs acquiesced to DSS's conduct or reporting of the Goods delivered to Wells Fargo and APL. Plaintiffs are still challenged by the difficulties of proving exactly how many items of Goods were not delivered either to Wells Fargo or to Betta, a problem which is caused by DSS's false reporting of the inventory of Betta's Goods in the warehouses. Plaintiffs have no consented to DSS's actions and the very prosecution of this adversary action is consistent with Plaintiffs' right to seek damages from DSS for the undelivered Goods.

DSS's fourth affirmative defense of laches, completely fails and should be dismissed.

### 5. DSS's Sixth Affirmative Defense Fails Because Wells Fargo Performed All of its Obligations Under the Oral Contract.

The sixth affirmative defense is alleged to be a defense that "the Trustee's claims are barred by failure of consideration..." which is a contractual defense. This defense applies to Plaintiffs' first claim, breach of oral contract between Wells Fargo and DSS, and to none of the

16

1  other, non-contract claims.  This defense also fails because Wells Fargo did meet all of its

2  obligations under the oral contract, by paying the monthly invoices it received from DSS.  DSS

3  was obligated to perform under the oral contract, which was mostly to safely store the Pre-

4  Petition Goods and to return all of the Pre-Petition Goods to Wells Fargo upon demand, because

5  Wells Fargo performed its obligations to pay DSS for those services.  This affirmative defense

6  fails because Wells Fargo did give consideration in the oral contract – a promise to pay in

7  exchange for a promise to safe-keep and deliver goods – and, in addition, Wells Fargo fulfilled it

8  promises to pay.

9        **6.**      **DSS's Ninth Affirmative Defense Fails Because Plaintiffs have Standing to**

10                      **Assert All of the Claims Against DSS.**

11        DSS alleges that Plaintiffs do not have standing to assert any claims against DSS because

12  of an irrevocable transfer to the Trust.  DSS's argument appears to be specific to Betta – Plaintiff

13  Betta does not have standing to assert the claims because of Betta's irrevocable transfer to the

14  Trust.  This argument fails because Betta holds bare legal title to assert any claims against DSS

15  that are based upon the bankruptcy code (Title 11 of the United States Code) and the Trust has

16  standing to assert all non-bankruptcy claims against DSS.

17        Originally, Betta had standing to assert all bankruptcy and non-bankruptcy claims against

18  DSS by virtue of the confirmed Chapter 11 Plan.  *See* section 2, *supra*, (the argument related to

19  the affirmative defense of waiver).  Then, on April 6, 2005, only 7 days prior to the date Betta

20  filed the complaint in this adversary proceeding, Betta irrevocably transferred to the Trust:

21          "...all right, title and interest in certain causes of action belonging to the Betta estate...to the Betta
22          Products Litigation Trust on the effective date for the benefit of holders of Allowed Claims and
           Allowed Interests... pursuant to and in accordance with this Trust Agreement, the Plan, and the
23          Confirmation Order."  *See* McCurnin Decl., Exhibit B, page 1, Recitals, paragraph B.

24        This irrevocable transfer included a transfer to the Trust of all right, title and interest in

25  the causes of action that Betta was permitted to assert against DSS in the confirmed Chapter 11

26  Plan.  The nature of this "irrevocable transfer" of these assets is described in paragraph 2.5 of the

27  Trust Agreement,

28

17

**BPI 0119**

> This Trust Agreement shall be irrevocable. Except as set forth in Section 12.1, neither Betta nor the Beneficiaries shall have any right or power, whether alone or in conjunction with others (in whatever capacity) to modify or amend this Trust Agreement. *See* McCurnin Decl., Exhibit B, page 3, paragraph 2.5.

This makes it impossible for Betta to nullify the transfer or to try to take back the assets that were transferred to the Trust, but it does not effect the actions that the Trust may take with regard to its new assets. The Trust, as complete and undisputed owner of the Trust assets, has the ability to sell, transfer, give, or otherwise dispose of the Trust assets, subject only to the limitations in the Trust Agreement. On April 6, 2005 (the same day the Trust was created), pursuant to Article IV, section 4.2 of the Trust Agreement, the Trustee transferred to Betta bare legal title to any and all claims against DSS. Therefore, Betta is a proper claimant in this arbitration because Betta possesses bare legal title to the claims against DSS.

DSS's ninth affirmative defense should be dismissed in its entirety.

**7.    DSS's Tenth Affirmative Defense Fails Because The Claims Against DSS Belonged to Betta, Not the Bankruptcy Estate, And It Is Not Necessary For The Trust to Have Representative of the Estate Status.**

Under the bankruptcy code, a plan may provide for the retention of a "representative of the estate" to settle or adjust claims or interest in the bankruptcy estate. *See* 11 U.S.C. §1123(b)(3). DSS argues that the Trust, which is not an entity mentioned in the confirmed Plan, does not have standing to assert any of the claims against DSS because it does not have official "representative of the estate" status in the confirmed Plan. This argument fails because the assets belonging to the Trust – the claims the Trust now asserts against DSS – are not interests of the bankruptcy estate. The claims asserted against DSS are assets that belonged to Betta, and which Betta freely transferred to the Trust.

A Chapter 11 Plan of reorganization is not required to include an appointment for a representative of the estate, but it is an option. *See* 11 U.S.C. §1123(b)(3)(B) (an optional plan provision is a statement that provides for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest [belonging to the debtor or to the estate].") Case law interpreting this statute has

18

---

1   clarified that what is meant by "any such claim or interest" is actually any such *bankruptcy* claim

2   or interest. *See In re Sweetwater*, 884 F.2d 1323, 1326 (10th Cir. 1989) (trustee appointed in

3   plan of reorganization to litigation claims under 11 U.S.C. §§544, 547, 549, and 553); *see also*

4   *In re Resorts Int'l, Inc.*, 145 B.R. 412, 474 (N.J. Bankr. 1990) ("In Chapter 11 cases, the

5   appointment of a representative of the estate under §1123(b)(3)(B) to pursue claims under §§544,

6   547, and 548 for the benefit of creditors is a frequently utilized device to administer a plan of

7   reorganization."); *see also In re Churchfield Management & Investment Corp.*, 122 B.R 76 (N.D.

8   Ill. Bankr. 1990) (trustee appointed in plan of reorganization to "prosecute and collect upon

9   claims for fraudulent conveyances").

10      With the exception of the seventh claim for relief, the claims that Betta and the Trust

11  have brought against DSS are state law claims and are not based on the bankruptcy code at all.

12  The first six claims of the Amended Complaint are:

13

14      Claim #1   Breach of Contract (oral contract between Wells Fargo and DSS)

15      Claim #2   Conversion

16      Claim #3   Breach of Bailment

17      Claim #4   Fraud

18      Claim #5   Negligent Misrepresentation, and

19      Claim #6   Negligence

20      Each of these claims are based upon state law or common law causes of action and are

21  not avoidance powers or other causes of action specifically created by the bankruptcy code.

22  These causes of action are *not*, therefore, claims or interests of the debtor that are subject to 11

23  U.S.C. §1123 and the prosecution of these claims is restricted only by the specific provisions of

24  the confirmed Plan.

25      The Plan gave to Betta (who is no longer a debtor-in-possession in a bankruptcy case but

26  a reorganized California corporation) the right to prosecute the above listed claims against DSS.

27  This was not a partial transfer; Betta was also given title and right to any proceeds that resulted

28

19

---

Memorandum in Support of Plaintiffs' Motion for Summary Judgment re Affirmative Defenses
Ad. Case No. 05-01046

**BPI 0121**

1    from litigation of the claims against DSS. *See* Plan, section 7.05 and 11 U.S.C. §1141(b). These

2    claims are completely freed from the completed bankruptcy proceeding because the claims were

3    entirely given to Betta.

         1.   The Trust is a legitimate claimant because the Trust obtained all rights to the
              Claims from Betta.

6        After the Plan was confirmed, Betta's Claims against DSS were assets of the reorganized

7    Betta and, just like any other individual or entity, the reorganized Betta had the ability and right

8    to transfer, sell, or otherwise dispose of that asset in any manner that it pleases. *See Bias v. Ohio

9    Farmers Indemnity Co.*, 28 Cal. App.2d 14, 16 (Cal. Ct. App. 1938) ("[I]t is a fundamental

10   principle of law that one of the chief incidents of ownership in property is the right to transfer

11   it"); *see also Douglas Aircraft Co. v. Byram*, 57 Cal. App. 3d 311, 317 (Cal. Ct. App. 1943) ("A

12   common characteristic of a property right, is that it may be disposed of, transferred to another").

14       Betta chose to transfer its asset – the Claims against DSS – to the Trust, which was a

15   legitimate transfer in exchange for "the mutual agreements of the parties contained herein and

16   other good and valuable consideration, the receipt and sufficiency of which are hereby

17   acknowledged..." *See* McCurnin Decl., Exhibit B, page 1. Betta specifically transferred "all

18   right, title and interest" in its claims against DSS to the Trust on April 6, 2005, which gave the

19   Trust ownership and legal right to pursue Betta's claims against DSS.

20       **8.      DSS's Eleventh Affirmative Defense Fails Because the Amended Complaint**

21       **Does Not Assert Claims that Were Subject to Arbitration.**

22       DSS's eleventh affirmative defense asserts that all of the Plaintiffs' claims in the

23   Amended Complaint should be dismissed because these claims were subject to arbitration under

24   the Contract between Betta and DSS. This defense fails because none of the claims in the

25   Amended Complaint are based upon the Contract, and, as DSS has argued previously, the tort

26   claims are not subject to arbitration.

27

28

Memorandum in Support of Plaintiffs' Motion for Summary Judgment re Affirmative Defenses
Ad. Case No. 05-01046

**BPI 0122**

1    The arbitration proceedings were concluded in November 2006, and the arbitration panel

2    made a very limited ruling that considered only Plaintiffs claim that DSS had breached the

3    Contract. This limited ruling implicitly acknowledged that the arbitration panel's jurisdiction

4    was limited to the breach of contract issues. The arbitration panel did not make a ruling or a

5    finding as to any claim other than the breach of contract claim. The tort claims of fraud,

6    negligence, conversion, and bailment were not presented to the arbitration panel for decision, and

7    they are not governed by the arbitration clause in a contract. DSS should be judicially estopped

8    from asserting this alleged affirmative defense because DSS argued, in a motion to dismiss filed

9    with the arbitration panel, that the tort claims were not subject to arbitration and should be

10   dismissed from the arbitration.

11   This affirmative defense fails because DSS has already taken the position that tort claims

12   are not subject to arbitration pursuant to the arbitration clause in the Contract, and because the

13   arbitration panel made findings only for the breach of contract claim.

14         **9.        DSS's Twelfth Affirmative Defense Fails Because Collateral Estoppel Does**

15                     **Not Apply to the Arbitration Award.**

16   DSS argues that the November 16, 2006 arbitration award has the force of collateral

17   estoppel and works to bar Plaintiffs' claims as issues that have already been litigated and

18   decided. This argument fails because the arbitration award is not entitled to any collateral

19   estoppel affect, and, to the limited extent that the arbitration award does have force as collateral

20   estoppel, it is applicable only to contract issues that will not affect the claims remaining the in

21   Amended Complaint.

22         **a.    The Arbitration Award is not entitled to any collateral estoppel effect.**

23   The Arbitration Award is a decision from a panel of arbitrators who held an evidentiary

24   hearing in Minnesota, to determine whether or not the Contract had been breached under the

25   laws of the state of Minnesota, as agreed to by the parties to the Contract in the Contract.

26   Therefore, the collateral estoppel effect of the Arbitration Award will be determined by

27

28

21

---

**BPI 0123**

1    Minnesota state law. *See Baldwin v. Kilpatrick*, 249 F.3d 912, 917 (9th Cir. 2001); *see also*

2    *Bugna v. McArthur*, 33 F.3d 1054, 1057 (9th Cir. 1994).

3         Minnesota laws of preclusion give four requirements before a judgment is entitled to

4    collateral estoppel: "(1) the issue was identical to one in a prior adjudication; (2) there was a

5    final judgment on the merits; (3) the estopped party was a party or in privity with a party to the

6    prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on

7    the adjudicated issue." *Ill. Farmers Ins. Co. v. Reed*, 662 N.W.2d 529, 531 (Minn. 2003).

8         The Arbitration Award was confirmed by the bankruptcy court and judgment was entered

9    on March 1, 2007, which judgment Plaintiffs have since appealed. Even though the Arbitration

10   Award has been treated as a final judgment by the bankruptcy court, the Arbitration Award is not

11   entitled to any collateral estoppel effect because none of the issues in the Amended Complaint

12   are identical to the issue decided by the arbitration panel, the judgment was not made on the

13   merits of the issues, and because the Plaintiffs were not given a full and fair opportunity to be

14   heard on the issues decided by the arbitration panel.

15                    **(i)        The Arbitration Award is not a judgment based upon the merits**

16                                 **of the issues it decided.**

17        The arbitrators held an evidentiary hearing on November 13, 2006, despite the fact that

18   they had clear communication from Plaintiffs that Plaintiffs had withdrawn their arbitration

19   claims and were electing to go forward with the bankruptcy causes of action first. It should not

20   have been surprising to the arbitrators when Plaintiffs did not appear at the evidentiary hearing.

21   Plaintiffs had clearly communicated to the arbitrators, and to DSS's counsel, that there was no

22   reason to hold a hearing on November 13, as Plaintiffs had withdrawn their arbitration demand

23   and were working to first litigate their tort claims in the bankruptcy court.

24        Thus, when the arbitrators began the hearing at 9:00 a.m. on November 13, there was no

25   one present who was capable of presenting Plaintiffs' case. The arbitrators conducted a one-

26   sided hearing, allowing Defendant to present its evidence and witnesses and later issuing an

27   Arbitration Award based upon only Defendant's presentation. This Arbitration Award was not

28   based upon the merits of the contract issues – the arbitrators were never even told the basis of

                                              22

1   Plaintiffs' claims.  The Arbitration Award was a one-sided opinion based entirely upon one

2   party's presentation of evidence and without anyone to represent what claims were even being

3   asserted against Defendant.  As such, the Arbitration Award is not a decision on the merits, it is a

4   decision based upon one-sided arguments.

5               **(ii)       Plaintiffs were not given a full and fair opportunity to be heard**

6                          **in the arbitration and the award is nothing more than a**

7                          **judgment in default.**

8           The arbitrators and DSS's counsel knew that Plaintiffs would not attend the evidentiary

9   hearing on November 13, 2006 because Plaintiffs communication was clear that the arbitration

10  was ended and that the only pending litigation was in the bankruptcy court.  The arbitrators held

11  the evidentiary hearing anyway, depriving Plaintiffs of the opportunity to present the evidence in

12  support of their claims and to challenge the deficiencies of Defendants' evidence and assertions.

13  The Arbitration Award is merely a default judgment in which the arbitrators presumed that all

14  the evidence presented by Defendant was true and did not afford Plaintiffs an opportunity to be

15  heard.

16          As a default judgment, the Arbitration Award is not entitled to any collateral estoppel

17  effect because collateral estoppel will apply only to those issues that are actually litigated and are

18  essential to the prior judgment.  *See Lyon Financial Services, Inc. v. Waddill*, 625 N.W. 2d 155,

19  160 (Minn. App. 2001); *see also In re Application of Hofstad to Register Title to Certain Land*,

20  376 N.W.2d 698, 700 (Minn. App. 1985). The Arbitration Award was not based on issues that

21  were actually litigated – it was based on the one-sided presentation of evidence by Defendant –

22  and, therefore, it has no collateral estoppel effect.

23          **b.   If the Court finds that the Arbitration Award does have collateral estoppel**

24               **effects, those effects are limited to specific breach of contract claims.**

25          The Arbitration Award gave a very limited ruling on two issues.  First, the arbitration

26  panel decided a procedural matter related to Plaintiffs' withdrawal from the arbitration, and

27  second, the arbitration panel decided that DSS did not breach any contractual duties related to the

28

Memorandum in Support of Plaintiffs' Motion for Summary Judgment re Affirmative Defenses
Ad. Case No. 05-01046

**BPI 0125**

1    breaches alleged in the Plaintiffs' specification of claims.  This ruling was essentially a finding
2    that:

3        1.    DSS did not overcharge Betta for monthly storage costs for the Post-Petition
4           or Pre-Petition Goods;

5        2.    DSS did not overcharge Wells Fargo for monthly storage costs for the Pre-
6           Petition Goods;

7        3.    DSS did not overcharge Betta for the year-end physical inventories conducted
8           on the last day of 1999, 2000, 2001, and 2002;

9        4.    DSS did not overcharge Betta for carton handling charges;

10       5.    DSS did not breach the Contract by failing to deliver all of the Pre-Petition
11          Goods; and

12       6.    DSS did not breach the Contract by failing to deliver all of the Post-Petition
13          Goods;

14       The arbitrators were very careful not to extend their ruling beyond the limits of the
15   Contract, and did not address at all the bailment and conversion claims that were alleged in the
16   Specification of Claims and later withdrawn.  This very narrow arbitration award has little
17   impact on the claims asserted in the Amended Complaint because the issues are entirely separate.

18       Plaintiffs do not assert, in the Amended Complaint, that DSS is liable under the Contract
19   for any over changes for monthly storage costs, or for over charges for carton handling fees, or
20   for overcharges for physical inventories.  Each of those claims is a contract claim that Plaintiffs
21   do not assert in the Amended Complaint.

22       The arbitrator's finding that DSS did not breach the Contract in failing to deliver the Pre-
23   Petition and Post-Petition goods is mutually independent of Plaintiffs' claims to recover under
24   non-contractual theories for DSS's failure to deliver.  The arbitrator's finding that DSS did not
25   breach the contract has absolutely no impact on Plaintiffs' tort claims for conversion, bailment,
26   fraud, and negligence.

27       Further, Plaintiffs' "breach of contract" claim asserted in the Amended Complaint is a
28   claim that DSS breached an oral contract with Wells Fargo, which was not an issue presented to

                        24

BPI 0126

1  the arbitrators.  The arbitrators' decision was specifically limited to breaches of duty "arising

2  under or by reason of the 'Agreement' dated May 1, 1996 between Betta and DSS, or depends in

3  whole or in part upon a finding that DSS collected any amounts from Betta or Wells Fargo in

4  excess of amount permitted by such 'Agreement.'"  The arbitrators were specifically addressing

5  issues related to the written Contract, in which the arbitration cause appears, and the arbitrator's

6  ruling has no impact on a Plaintiffs' separate claim for breach of an oral contract between Wells

7  Fargo and DSS.

8      Therefore, even if the Court decides to give collateral estoppel to the Arbitration Award,

9  there would be no impact or effect upon the issues that are now before the bankruptcy court

10  through the Amended Complaint.

11      **10.    DSS's Thirteenth Affirmative Defense Fails Because Betta and Wells Fargo**

12           **Did Not Abandon the Goods.**

13      DSS alleges that Betta and Wells Fargo abandoned the goods that remain in the DSS

14  warehouse, and that all of Plaintiffs' claims should be dismissed by nature of the abandonment.

15  This defense is completely unsupported.  There are no facts showing that Betta or Wells Fargo

16  abandoned the goods that remain in the DSS warehouses.  Despite demands, Betta and Wells

17  Fargo have been unable to retrieve their goods from DSS, and DSS's falsified accounting has

18  made it very difficult for Betta and Wells Fargo to even make a precise demand for the exact

19  quantity of goods that were withheld.  This affirmative defense should be denied because DSS

20  has been withholding goods that Wells Fargo and Betta did not abandon and, for which, Wells

21  Fargo and Betta and still seeking recovery.

22      **11.    DSS's Fifteenth Affirmative Defense Fails Because The Claims Against DSS**

23           **Were Preserved in the Confirmed Plan.**

24      As argued, *supra*, DSS's argument that Plaintiffs claims were not preserved in the

25  Confirmed Plan are incorrect.  Plaintiffs' right and ability to seek recovery from DSS for tort

26  claims is preserved in section 7.04 of the Confirmed Plan, and Plaintiffs' right to assert claims on

27  behalf of Wells Fargo is preserved in Exhibit A to the Confirmed Plan.

28

**BPI 0127**

1    **12.    DSS's Eighteenth Affirmative Defense Fails Because The Settlement Between**
2    **Wells Fargo and DSS Could Not Settle Claims Previously Assigned to Betta.**

3    DSS alleges that there was a Settlement and Release Agreement between Wells Fargo
4    and DSS dated September 30, 2004, in which all claims between Wells Fargo and DSS were
5    resolved. This affirmative defense fails and should be dismissed because it was not possible for
6    Wells Fargo to settle claims it no longer possessed.

7    Even assuming that DSS's allegation is true and there is a "Settlement and Release
8    Agreement" between Wells Fargo and DSS dated September 30, 2004, this defense still fails
9    because the Settlement Agreement between Wells Fargo and Betta is dated March 2004 – several
10   months before DSS's alleged settlement agreement. In the Settlement Agreement between Wells
11   Fargo and Betta, Wells Fargo assigned to Betta all right and title to bring claims for recovery
12   against DSS. Only the proceeds of recovery, if any, from Wells Fargo's claims against DSS
13   were reserved to Wells Fargo in the Settlement Agreement. Therefore, whatever the settlement
14   was between Wells Fargo and DSS in September of 2004, that agreement could not have settled
15   any claims belonging to Betta. The affirmative defense fails and should be dismissed.

16   **IV.    CONCLUSION**

17   Based upon the foregoing arguments, Plaintiffs request that this Court enter an order finding that
18   the following material facts are undisputed:

19         1.    Plaintiffs also request that this Court enter summary judgment dismissing DSS's
20              first, second, third, fourth, sixth, ninth, tenth, eleventh, twelfth, thirteenth,
21              fifteenth, and eighteenth affirmative defenses.

22   Respectfully Submitted,

23   DATED:  July 6, 2007                           BRINKMAN PORTILLO, PC
24

25
26                                          _____/s/ Laura J. Portillo_____
                                           Laura J. Portillo
27                                         Special counsel for Betta Products, Inc., and
                                           Dana McCurnin, Trustee of the Betta
28                                         Products Litigation Trust

26