# EXHIBIT "5"

**BPI 0129**

Daren R. Brinkman (State Bar No. 158698)
Laura J. Portillo (State Bar. No. 186813)
BRINKMAN PORTILLO, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Telephone: (818) 597-2992
Facsimile: (818) 597-2998

Special counsel to Betta Products Inc.
and special counsel to the Betta
Products Litigation Trust

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SANTA ROSA DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 03-10925 AJ |
| BETTA PRODUCTS, INC., a California Corporation | Chapter 11 |
| | Adversary No. 05-01046 |
| Debtor. | |
| BETTA PRODUCTS, INC., the Debtor in Possession, and the Betta Products Litigation Trust, | **DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE AFFIRMATIVE DEFENSES** |
| Plaintiff, | |
| v. | Date: August 3, 2007 |
| DISTRIBUTION SYSTEMS AND SERVICES, INC., aka DSS, | Time: 10:00 a.m. |
| | Location: 99 South E Street Santa Rosa, CA |
| Defendant. | |

I, Dana McCurnin, hereby declare as follows:

1. I am a resident of Sonoma County, California, I am over the age of eighteen, and I am mentally competent to make this declaration.

1

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT-- Ad. No. 05-01046

**BPI 0130**

2. I have personal knowledge of the facts set forth herein and, if called upon to do so at trial, could and would competently testify thereto.

3. I am a member of the board of directors of Betta Products, Inc. (hereafter, "Betta") and I have held this position continuously since the beginning of 2004.

4. I was employed by Betta from approximately 1992 through 2005.

5. During my employment with Betta I worked in the accounting department and I worked on Betta's accounts payable, including the account payable to Distribution Systems and Services, Inc. ("DSS").

6. Betta had a contract with DSS that was entered into on May 1, 1996 (hereafter, "Contract"). I did not participate in the negotiation of the Contract, but I was an employee of Betta when it was signed.

7. Betta used DSS as its exclusive warehousing and distributing agent from 1996 until June of 2004.

8. Betta is a California corporation that sold paper and party products to retail stores in the United States and elsewhere.

9. Betta did not manufacture the paper and party products it sold; Betta hired manufacturing companies to make the products it sold.

10. Betta entered into a written contract with DSS on May 1, 1996 (hereafter, the "Contract"), in which DSS agreed to warehouse Betta's products and to distribute those products to Betta's customers upon instruction from Betta. Betta agreed to pay DSS for these services. A true and correct copy of the Contract is attached to this declaration as Exhibit A.

11. DSS had a warehouse in Ontario, California and a warehouse in Minnesota.

**BPI 0132**

12. Most of Betta's goods were shipped to the DSS warehouse in Ontario, but some goods were shipped to the DSS warehouse in Minnesota.

13. DSS was obligated, under the Contract, to keep accurate accounting records of all the goods that were shipped into the warehouses.

14. DSS kept a perpetual inventory of how many items were stored in the warehouse.

15. Betta was able to access DSS's perpetual inventory records electronically, and Betta used these records to create Betta's own perpetual inventory.

16. In December 31, 2002 and at Betta's request, DSS conducted a year-end physical inventory of the Betta products stored in the warehouses.

17. For the year-end physical inventory, DSS's employees would physically count all of the boxes of goods that were stored in the warehouse.

18. A physical inventory usually takes several days to complete.

19. During the December 31, 2002 physical inventory, while DSS employees were counting the boxes, Betta sent its own employees to the warehouse to "spot check" the inventory.

20. The Betta employees opened several boxes, selected at random, and counted the items in each box.

21. After the physical inventory for December 31, 2002 was finished, DSS reported the physical count totals to Betta.

22. I have reviewed the documents produced by DSS in response to Plaintiffs' Requests for Production of Documents.

23. I have reviewed the documents produced by DSS that constitute a reporting of the inventory DSS stored for Betta ("DSS Inventory Report").

3

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– Ad. No. 05-01046

**BPI 0133**

24. I have reviewed the report on the DSS Inventory Report showing the count for each product for the physical inventory that occurred on December 31, 2002, and I believe that count to be true and correct.

25. Both Betta and DSS adjusted their perpetual inventories to reflect the count accomplished in the physical inventory.

26. After the Petition Date, Betta continued to ship products to and from the DSS warehouses.

27. Every time DSS received a shipment of goods, DSS would send a report to Betta, informing Betta of how many goods were received.

28. Whenever Betta made a request for DSS to ship products out to Betta's customers, several reports were generated and exchanged between DSS and Betta.

29. Betta relied upon the reports it received from DSS to keep an accurate perpetual inventory.

30. Betta did not have access to or physical possession of the inventory, and had no other choice than to rely on DSS's records.

31. Betta relied upon DSS's records as it made sales to customers and made decisions of when to purchase more of a certain kind of product.

32. I have reviewed the documents produced by DSS in discovery in this adversary case. Specifically, I have reviewed the inventory accounting records produced by DSS (hereafter, "DSS Inventory Report").

33. Reserved.

34. Betta had a significant quantity of goods stored in the DSS warehouses on April 15, 2003 (the "Petition Date").

35. DSS was one of the unsecured creditors in Betta's bankruptcy proceedings.

36. Betta continued to use DSS as a warehousing and distributing agent after the Petition Date as well.

37. Betta continued to send shipments of new product to the DSS warehouses after the Petition Date.

38. DSS required Betta to pre-pay for the warehousing and distributing services, by making consistent, weekly payments.

39. After the Petition Date, Betta made the following payments to DSS:

| date | check number | amount |
|---|---|---|
| 4/25/2003 | 1001 | -$42,000.00 |
| 5/14/2003 | 1106 | -$21,000.00 |
| 5/22/2003 | 1123 | -$21,000.00 |
| 5/29/2003 | 1145 | -$21,000.00 |
| 6/5/2003 | 1162 | -$21,000.00 |
| 6/11/2003 | 1221 | -$21,000.00 |
| 6/20/2003 | 1241 | -$21,000.00 |
| 7/3/2003 | 1285 | -$21,000.00 |
| 7/11/2003 | 1303 | -$21,000.00 |
| 7/22/2003 | 1364 | -$10,000.00 |
| 7/28/2003 | 1393 | -$10,000.00 |
| 8/4/2003 | 1402 | -$10,000.00 |
| 8/26/2003 | 1513 | -$10,000.00 |
| 8/29/2003 | 1533 | -$10,000.00 |
| 9/10/2003 | 1552 | -$10,000.00 |
| 9/10/2003 | 1552 | -$10,000.00 |
| 9/19/2003 | 1613 | -$6,000.00 |
| 9/26/2003 | 1637 | -$6,000.00 |
| 10/3/2003 | 1658 | -$6,000.00 |
| 10/10/2003 | 1673 | -$6,000.00 |
| 10/17/2003 | 1704 | -$6,000.00 |
| 10/21/2003 | 1723 | -$6,000.00 |
| 10/31/2003 | 1749 | -$6,000.00 |
| 11/7/2003 | 1771 | -$6,000.00 |
| 11/14/2003 | 111402 | -$507.61 |

| Date | Number | Amount |
|---|---|---|
| 11/21/2003 | 1818 | -$6,000.00 |
| 12/23/2003 | 1933 | -$6,000.00 |
| 12/30/2003 | 1967 | -$6,000.00 |
| 12/31/2003 |  | -$3,859.47 |
| 1/9/2004 | 1988 | -$6,000.00 |
| 1/23/2004 | 2015 | -$12,000.00 |
| 3/26/2004 | 2197 | -$6,000.00 |

40. Betta paid a total of $374,367.08 to DSS, after the Petition Date, to compensate DSS for the services that DSS performed for Betta.

41. The total amount of the invoices DSS sent to Betta after the Petition Date was $367,663.70. A true and correct copy of each of the post-petition invoices is attached to this declaration as Exhibit B.

42. Betta paid DSS more than what was owed for DSS's post-petition services.

43. After the Petition Date, Betta requested that DSS keep the Pre-Petition Goods separate from the Post-Petition Goods.

44. DSS refused to honor this request, and the Pre-Petition Goods remained in DSS's custody and care.

45. Betta abandoned the Pre-Petition inventory to Wells Fargo Bank, N.A. ("Wells Fargo"), a creditor in the bankruptcy, in July of 2003.

46. Wells Fargo was one of Betta's largest creditors in the bankruptcy.

47. After Betta abandoned the Pre-Petition Goods to Wells Fargo, the Pre-Petition Goods remained in the DSS warehouses.

48. After Betta abandoned the Pre-Petition Goods to Wells Fargo, Betta did not pay the storage charges from DSS for the Pre-Petition Goods.

49. DSS told me that Wells Fargo paid the monthly storage charges for the Pre-Petition Goods.

6

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– Ad. No. 05-01046

BPI 0136

50. Wells Fargo told me that Wells Fargo paid the monthly storage charges for the Pre-Petition Goods.

51. Wells Fargo tried to find a buyer for the Pre-Petition Goods in the latter half of 2003.

52. Wells Fargo was successful and found a buyer at the very end of 2003.

53. Betta and Wells Fargo worked together to produce an accounting of all of the Pre-Petition Goods.

54. In or about December 2003 or January 2004, Wells Fargo demanded that DSS deliver all of the Pre-Petition Goods to Wells Fargo or Wells Fargo's agent, Hilco Wholesale Trading ("Hilco").

55. In January 2004, DSS did ship a quantity of goods to Wells Fargo.

56. At the end of January 2004, Wells Fargo informed Betta that DSS had not delivered all of the Pre-Petition Goods.

57. Betta continued to use DSS as its sole warehousing and distribution agent from the Petition Date until approximately June 1, 2004.

58. In or about March, 2004, Betta began looking for a different warehousing and distribution agent, to replace DSS.

59. Betta hired APL Logistics WMS, Inc. ("APL") in or about April 2004 to become the sole warehousing and distributing agent for Betta.

60. Betta notified DSS of the change and requested that DSS transfer all of the Betta goods in the DSS warehouses to APL.

61. Specifically, Betta wanted the goods transferred to the APL warehouse in Rancho Cucamonga, California.

7

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– Ad. No. 05-01046

**BPI 0137**

62. Betta received reports from DSS stating that the transfer was being made in more than one shipment.

63. Betta received reports from APL about the total quantity of goods APL received from DSS.

64. DSS did not ship the full quantity of Betta's goods to APL.

65. I have reviewed the records produced by APL, the DSS Inventory Report, and the records kept by Betta.

66. Based upon my review I have determined that the DSS Inventory Report is wrong.

67. The DSS Inventory Report is wrong in its report about shipments out of the DSS warehouse.

68. Betta relied upon DSS's records as it made sales to customers and made decisions of when to purchase more of a certain kind of product.

69. Betta's Chapter 11 Plan of Reorganization was confirmed on May 17, 2004.

70. Prior to the Plan's confirmation order, Betta and Wells Fargo had come to a settlement agreement regarding the debt Betta owed to Wells Fargo.

71. The settlement agreement was written down and dated March 2004. This settlement agreement with Wells Fargo was made a part of the confirmed Plan of Reorganization.

72. I am the Trustee of the Betta Products Litigation Trust ("Trust") which was formed on April 6, 2005.

73. On April 6, 2005, Betta transferred all of its right and title to prosecute adversary actions, as described in the confirmed Chapter 11 Plan of Reorganization ("Plan") to the Trust.

8

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– Ad. No. 05-01046

**BPI 0138**

74. A true and correct copy of the Betta Products Inc. Litigation Trust Agreement is attached to this declaration as Exhibit C.

75. On the same day the Trust was formed, April 6, 2005, the Trust transferred back to Betta the bare legal title of the choses in action that Betta has just transferred to the Trust. The Trust retained the right to any recovery from these choses in action.

76. A true and correct copy of the Betta Products, Inc. Litigation Trust Transfer of Assets and Litigation Cooperation Agreement ("Transfer Agreement") is attached to this declaration as Exhibit D.

77. As Trustee, I made the decision to transfer bare legal title back to Betta to avoid standing questions in the litigation. Betta did not influence my decision on behalf of the Trust.

78. Betta signed the Transfer Agreement to acknowledge its receipt of bare legal title to prosecute the adversary actions.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 22, 2007 in Santa Rosa, California.

_Dana McCurnin_

DECLARATION OF DANA MCCURNIN IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – Ad. No. _____

BPI 0139